UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| LORRAINE LONGMOOR, *et al.,*<br>*plaintiff,*<br><br>V.<br><br>KARL NILSEN, *et al.,*<br>*defendants.* | :  NO. 3:02CV-1595 (JBA)<br>:<br>:<br>:<br>:<br>:<br>:  OCTOBER 21, 2003 |

### AFFIDAVIT OF JOHN BEMENT

I, John Bement, being of sound mind and legal age, and having been duly sworn, do hereby depose and say:

1. For the purposes of identification, my full name is John Roberts Bement. I am currently employed by the State of Connecticut, Department of Public Safety. I have been so employed for about nineteen years. I am currently assigned as the Resident Trooper for the Town of Barkhamsted. I have been so assigned for approximately four years.

2. In the spring of 2000, I held the rank of Trooper First Class, and was assigned as the Resident Trooper for the Town of Barkhamsted. As a resident trooper, I was responsible for all aspects of law enforcement in the community to which I was assigned.

3. On or about April 30, 2000, I was off duty on a regularly scheduled day off. I was contacted by someone at Troop B in Canaan and asked to call Trooper Matt Hazen. When I telephoned Trooper Hazen, I was given information that there was a civil land dispute issue which had arisen at Woodland Acres, a private subdivision in the Town of Barkhamsted. I was told that the dispute involved placing a chain across Woodland Acres Road to block access to the subdivision. I was told that the parties involved had been directed to contact me at the resident

trooper's office in Barkhamsted in order to discuss the problem. I was told the residents had been asked to show me any documentation which might exist and which could clarify their rights to the property in question. I had also been given the names of Lorraine Longmoor and Lyndsey Keene as the complainants who were coming to see me.

4. When I returned to the office on Tuesday, May 2, 2000, I did some independent research in the land records for the Town of Barkhamsted in order to prepare for the upcoming meeting. With the assistance of the town clerk, I located a subdivision plot plan for Woodland Acres and learned that the developer was Burton Carroll. In checking the land records, I learned that Lorraine Longmoor possessed two parcels of land in Woodland Acres -- a large multi-acre plot, and a small .12 acre parcel of land recorded as Lot 14A. Because of my familiarity with the area, I immediately recognized that the actual roadway into Woodland Acres was not in the location depicted on Burton Carroll's subdivision plot plan on file in the town clerk's office. I also recognized that Lot 14A was not a properly configured building lot. I knew that Woodland Acres Road was a private, gravel right of way which had never been accepted as a public road by the Town of Barkhamsted, and surmised that the dispute probably centered around this parcel of land in some way.

5. Lorraine Longmoor and Lyndsey Keene came to my office between 10:00 and 11:00 a.m. on Tuesday morning, May 2, 2000. We all sat down and Longmoor began to explain the problem. Longmoor explained that she was the sole owner of a parcel of land in the Woodland Acres subdivision known as Lot 14A. She showed me a quit claim deed which she said established her title to the property. A copy of the quit claim deed that was provided to me by Lorraine Longmoor is attached to this affidavit at Tab A. She also showed me a partial map of

2

the subdivision depicting the area surrounding Lot 14A, but then I showed her the copy of the entire subdivision map I had just obtained from the town records. A copy of the partial map provided to me by Lorraine Longmoor is attached to this affidavit at Tab B. Using the big map, we agreed that the road which crossed Lot 14A was the only access into the subdivision, and that the road depicted on the subdivision map did not exist. I asked why the road had not been constructed in the location shown on the map. Lyndsey Keene responded that because there was ledge rock in the right of way depicted on the plot plan, the builder had taken a short cut.

6. I knew from my own experience that the existing road had been in existence in its present location for a number of years. I asked Longmoor why now, after all these years, it became important to put up a chain to block access to the subdivision. Lyndsey Keene stated that it was her legal right to put up a chain on their property. Keene said that Longmoor had negotiated the possibility of creating easements to cross Lot 14a with each of the neighbors, but that they had not been totally successful. Keene stated that all of the other landowners in the subdivision admitted that Lorraine Longmoor owned Lot 14A.

7. I acknowledged that Lot 14A appeared to be Longmoor's property. However, I told Longmoor and Keene that it didn't make sense that all of the lots in the subdivision beyond where the road crossed Lot 14A would be landlocked. I told them that I knew that the road had existed for a period of time far longer than the quit claim deed indicated that Lot 14A belonged to Lorraine Longmoor. I told them that the quit claim deed they had shown me did not address the possibility that there could be a pre-existing easement or some other similar claim to use Woodland Acres Road where it crossed Lot 14A. I told them that based on the information I had been provided, I could not agree that they had an absolute ownership interest in Lot 14A such

3

that they could lawfully place a chain across Woodland Acres Road where it crossed Lot 14A to prevent access to the remainder of the subdivision. I told Longmoor and Keene that they should go to court to clarify the extent of the ownership interest in Woodland Acres Road where it crossed Lot 14A, and to determine whether they had a legal right to landlock the other property owners. I told Longmoor and Keene that I was going to seek the advice of our local assistant state's attorney in the Bantam courthouse who would, in any event, be called upon to prosecute the case if someone was arrested. I told Longmoor and Keene that, at this point, I couldn't tell them whether to take down the chain or to put it up. I did, however, advise, them that their actions could create circumstances in which the State Police would have to become involved if there occurred a physical or verbal altercation between the neighbors.

8. Before they left, I asked Longmoor and Keene whether they had provided a key to the chain lock to the local fire department in case emergency vehicles required access to Woodland Acres. Longmoor replied that she had. After they left, I telephoned the head of the Barkhamsted Fire District, Richard Winn, and confirmed that keys to the chain lock had been provided.

9. I telephoned Assistant State's Attorney Andrew Wittstein at the Bantam courthouse at about 12:30 p.m. that day. I explained the situation to Attorney Wittstein as I understood it. Attorney Wittstein advised me that Longmoor had a legal right to place a chain across the gravel road within the boundaries of her property. Attorney Wittstein said that I should take a case number if the chain across the road was damaged, and submit an arrest warrant affidavit based on the facts. Attorney Wittstein told me that under the circumstances, it was not likely that such an arrest warrant affidavit would be signed. Attorney Wittstein told me not to arrest anyone for trespassing simply for crossing Lot 14A unless Lorraine Longmoor first obtained an injunction

4

barring others from using Woodland Acres Road where it crossed her property. I advised Attorney Wittstein that Longmoor had been advised that a civil remedy was the best course of action, and he agreed.

10. After finishing with Attorney Wittstein, I spoke with Lieutenant Tolomeo, the commanding officer of the Canaan State Police barracks. Lieutenant Tolomeo advised me to put a memorandum regarding this situation in writing, and to put it into the roll call book so other troopers would be aware of the status of Lorraine Longmoor's claims regarding Lot 14A and Woodland Acres Road. Following Lieutenant Tolomeo's advice, I completed the memorandum, which is attached to this affidavit at Tab C, and attached to it the map depicting Lot 14A given to me by Lorraine Longmoor as well as a partial map of the subdivision also given to me by Lorraine Longmoor.

11. I faxed my memorandum to Lieutenant Tolomeo from the resident trooper's office. He indicated that he had also spoken with Attorney Wittstein, and that he was going to come out to Barkhamsted so he could view the scene and meet with Lorraine Longmoor and Lyndsey Keene to be sure there was no lack of clarity regarding the position of the State Police in the ongoing property dispute.

12. Lieutenant Tolomeo, Trooper David Laboy and myself met with Lorraine Longmoor and Lyndsey Keene at their home at 24 Woodland Acres Road in Barkhamsted at about 2:00 p.m. on the afternoon of May 2, 2000. Trooper Laboy accompanied us because he had the patrol assignment that day which included Woodland Acres. Lieutenant Tolomeo clarified to Longmoor and Keene that the State Police would respond to calls for service involving the property dispute, but that it was primarily a civil matter. He told them that we recognized the

fact that Longmoor owned Lot 14A, but that the existence of other property claims could not be discounted based on the quit claim deed she had shown us. Longmoor showed us a document which appeared to be an agreement between her and other subdivision landowners creating easements in favor of William Langer and Richard Zappulla, other landowners in the subdivision. A copy of that agreement is attached to this affidavit at Tab D. It was unclear to us what rights, if any, this document created.

13. Lieutenant Tolomeo emphasized that Longmoor needed to go to court to clarify the precise extent of her ownership interest in Lot 14A before we could enforce whatever ownership rights existed. Despite the lieutenant's encouragement to clarify their legal rights to Lot 14A before putting the chain across Woodland Acres Road, Longmoor and Keene remained adamant that they wanted to block the road. Lieutenant Tolomeo did not tell them that they couldn't block the road. He did tell them, however, that if any confrontations resulted from the situation, such as a breach of the peace or an assault, people could be arrested. Lieutenant Tolomeo told Longmoor and Keene that until the property rights were clarified, the State Police would simply enforce the public safety aspects of any situation that erupted on Lot 14A.

14. On May 4, 2000, I was copied on a letter faxed to me from Lorraine Longmoor to the Barkhamsted First Selectman, Michael Fox. The letter informed Mr. Fox that an oversized modular home was to be delivered to the Woodland Acres subdivision and was to be brought across Lot 14A. The letter indicated that Longmoor considered this to be a health and safety issue. Longmoor asked Mr. Fox to revoke the building permit for Lot #2 until the problem could be addressed. A copy of the letter is attached to this affidavit at Tab E. I determined that the

6

complaint in the letter did not pertain to my functions as the resident trooper, but was best handled by town officials.

15. The next exposure I had with Lorraine Longmoor and Lyndsey Keene concerning this property dispute was when Keene contacted the State Police at about 8:35 a.m. on May 5, 2000, to complain that a well-driller was in the subdivision and presumably had removed the chain and crossed Lot 14A without permission. Upon arrival I spoke with Keene and inspected the chain which was up and blocking Woodland Acres Road. The well-driller was inside the chain operating a large utility truck and wanted to leave the area. His egress from Woodland Acres was being blocked by the chain. According to the driller, he did not remove the chain in order to gain access to the subdivision. The chain was not damaged. I advised Keene that he could not imprison the well-driller and his vehicle in the subdivision by blocking the road with a chain. I told Keene that he would have to remove the chain to permit the well-driller to leave or I would have to arrest him for unlawful restraint. Keene agreed and removed the chain, allowing the well-driller to leave. I took no further action and left after the well-driller departed.

15. My next exposure to the Woodland Acres property dispute occurred on May 17, 2000. Someone called the Troop B dispatcher and complained that a modular home was blocking Woodland Acres Road. I responded to the scene and observed that Woodland Acres Road was not being blocked by a modular home, but by an unoccupied private automobile parked inside the chain where Woodland Acres Road crossed Lot 14A. I observed that the chain was down and, but for the car blocking the roadway, the truck towing the modular home could have entered the property to deliver the home.

7

16. I was approached by William Langer, a property owner in the subdivision. Langer told me that the car was blocking access to the subdivision. Langer wanted me to tow the car out of the way. I told Langer that Woodland Acres Road was a private right of way and that I had no authority to tow the car which was blocking the road. Langer asked me if he could have the car towed. I told him that was a matter between him and the tow truck operator. Langer told me he was going to call a tow truck. I remained on the scene to preserve the peace if it became necessary to do so.

17. About thirty minutes later, a tow truck from PJ's Towing arrived. Lyndsey Keene arrived at about the same time. Lorraine Longmoor was with him. The tow truck operator tried to open the car door and found that it was locked. The tow truck operator said that it would be easier if he had the keys. Langer spoke with Longmoor and Keene about the keys, telling Longmoor that it would be much easier if she just moved the car. Longmoor refused to remove the car. The tow truck operator then approached me and asked if he was going to get into trouble if he towed the car. I told him that towing the car was a private business arrangement between him and whomever called him, and that I was just here to keep the peace. As the tow truck operator was preparing to hook up the locked car, Keene approached me and asked what was going to happen if the tow truck operator damaged the car. I told Keene that it was a civil matter, but that the car could be damaged if towed in gear. While I was having this discussion with Keene, Longmoor gave her keys to the tow truck operator. The operator then opened the car, put it in neutral and pulled it up onto his flatbed truck. The tow truck operator then backed up Woodland Acres Road and deposited the vehicle in Longmoor's driveway.

18. Once the obstructing vehicle was removed, the truck towing the modular home entered the subdivision via Woodland Acres Road and delivered the home to Langer's property. I remained in the area for another thirty minutes or so to be sure that there would be no further problems. Once Longmoor and Keene departed, I also departed.

19. While talking with Lyndsey Keene, I reiterated to Keene that I couldn't tell him whether or not to put up the chain, but that, if he did, he could not block anyone from leaving the subdivision. I told Lyndsey Keene that if prevented someone from leaving the subdivision, he would be arrested for unlawful restraint. I reminded Lyndsey Keene that I was only there for public safety purposes until the property dispute issues were clarified in court, and that I would not tell anyone whether they could put up the chain or take it down. I told Keene that he should do what he considered to be in his own best interests. At this time, William Langer and his wife were also present. I also told them that they should do what they felt was in their best interests. I advised everyone that, while we acknowledged Longmoor's ownership of Lot 14A, it had not been proven that someone else did not also have an easement to use that property. I told everyone that the only way we would enforce Longmoor's property rights was if there was a court order which recognized her as the sole property owner with no easements attached. Until then, I told them we would enforce the laws concerning breach of peace, assault or criminal mischief, and generally protect the public safety until the property dispute could be resolved in court. After saying this to everyone present, I left.

20. On or about May 24, 2000, Lorraine Longmoor sent a letter of complaint concerning State Police involvement in the property dispute through her attorney to the Commissioner of Public Safety. A copy of this letter is attached to my affidavit at Tab F. The letter alleged that I

threatened to arrest Longmoor for putting up the chain on May 1, 2000. I was not present at her property on that date. This statement was patently untrue. By happenstance, I ran into Lyndsey Keene at the town hall and expressed to him my dismay over my name having been included in the letter. Keene told me that he and Longmoor never meant to put my name in the letter, and that it had been done by their attorney without their knowledge. Several days later, I received a handwritten letter from Lorraine Longmoor and Lyndsey Keene dated May 31, 2000. In this letter, Longmoor and Keene apologized for including my name in the letter sent to Dr. Lee, saying that they felt I had been very fair and unbiased in the performance of my duties. A copy of this letter is attached to this affidavit at Tab G.

21. To this date, I have not been informed of the status of Lorraine Longmoor's ownership rights with regard to Lot 14A. I do know, however, that Woodland Acres Road has been moved from her property back to the right of way where it originally should have been constructed.

I have read the foregoing affidavit consisting of ten pages. It is true and accurate to the best of my knowledge.

_____ #1073
Affiant

Subscribed and sworn to before me this __21st__ day of __October__, __2003__.

_____
Notary Public/Commissioner of the
Superior Court

10