UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

*FILED*
Nov 10    9 31 AM '03
U. S. DISTRICT COURT
NEW . . . CONN.

LORRAINE LONGMOOR, *et al.*,                  :          NO. 3:02CV-1595 (JBA)
    *plaintiff,*                                        :

    V.                                                          :

KARL NILSEN, *et al.*,                                :
    *defendants.*                                      :          NOVEMBER 7, 2003

## MEMORANDUM OF LAW
## IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

This is a federal civil rights action brought pursuant to 42 U.S.C. § 1983 by the plaintiffs,

Lorraine Longmoor and Lyndsey Keene, against the defendants, Lieutenant Robert Tolomeo,

Trooper David Laboy, Trooper Matthew Hazen, and Trooper Patrick Sweeney, of the

Connecticut State Police, and various officials of the Town of Barkhamsted, Connecticut. The

lawsuit arises out of the defendants' allegedly unsatisfactory handling of a property dispute

between the plaintiffs and their neighboring landowners in which the neighbors allegedly

encroached upon the plaintiffs' property by using a private roadway into the Woodland Acres

subdivision, a small portion of which crossed the plaintiffs' land. The plaintiffs claim that the

State Police defendants' handling of the dispute violated their federal constitutional rights under

the Equal Protection Clause, violated their rights to substantive and procedural due process under

the Fourteenth Amendment, constituted an unlawful bill of attainder, and violated their rights

under Connecticut common law. In recompense for their injuries, the plaintiffs seek

compensatory damages, punitive damages, and attorneys fees pursuant to 42 U.S.C. § 1988.

On September 26, 2003, the Court, pursuant to the State Police defendants' motion for

judgment on the pleadings, granted judgment in favor of the State Police defendants as to all of

the claims raised by the plaintiff, Lyndsey Keene. In addition, the Court granted judgment in

favor of the State Police defendants as to the claim of Lorraine Longmoor for violation of her

rights under the substantive due process clause of the Fourteenth Amendment, as well as for her

claim that the actions of the State Police constituted a bill of attainder. This motion seeks

judgment in favor of the State Police defendants as to the remaining claims for violation of

Lorraine Longmoor's right to equal protection and procedural due process under the Fourteenth

Amendment, as well as her apparent claim for intentional infliction of emotional distress.

### STANDARD OF REVIEW
### ON SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) requires the entry of Summary Judgment ". . . if

the pleadings, depositions, answers to interrogatories, and admissions on file together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to judgment as a matter of law." A factual dispute is "genuine" when "the

evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202

(1986). A "material fact" is one whose resolution will affect the ultimate determination of the

case. *Id.* In determining whether a material issue of fact exists, the court must resolve all

ambiguities and draw all inferences against the moving party. *See Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. at 255, 106 S.Ct. at 2513; *J.F. Feeser, Inc. v. Serv-A-Portion, Inc.*, 909 F.2d 1524,

1531 (3d Cir. 1990), *cert. denied,* 499 U.S. 921, 111 S.Ct. 1313, 113 L.Ed.2d 246 (1991).

However, "the mere existence of *some* alleged factual dispute between the parties will not defeat

an otherwise properly supported motion for summary judgment; the requirement is that there be

no *genuine* issue of *material* fact." *Samuels v. Smith,* 839 F.Supp. 959, 962 (D.Conn. 1993).

2

Despite the above, the party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 256, 106 S.Ct. at 2510; *see also, Knight v. United States Fire Insurance Co.,*, 804 F.2d 9, 12 (2d Cir. 1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 763 (1987); *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir. 1980). Thus, once the moving party has satisfied its burden of identifying evidence which demonstrates the absence of a genuine issue of material fact, the non-moving party is required to go beyond the pleadings by way of affidavits, depositions, and answers to interrogatories in order to demonstrate specific material facts which give rise to a genuine issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed. 265 (1986). "Neither courts nor defendants should be subjected to trials which can be little more than harassment." *Applegate v. Top Associates, Inc.*, 425 F.2d 92, 96 (2d Cir. 1970).

When Rule 56(e) shifts the burden of proof to the non-moving party, that party must produce evidence to show the existence of every element essential to the case which it bears the burden of proving at trial. *Equimark Commercial Finance Co. v. C.I.T. Financial Services Corp.*, 812 F.2d 141, 144 (3d Cir. 1987). Where evidence is submitted in support of, or in opposition to, a motion for summary judgment, such evidence must be presented in a manner consistent with its admissibility at trial. *See* Local Rules of Civil Procedure, Rule 56(a)3; *First National Bank Co. of Clinton, Ill. v. Insurance Co. of North America*, 606 F.2d 760 (7th Cir. 1979) (in ruling on summary judgment motion, the District Court properly relied on documents and exhibits identified by affidavit). Unsworn statements of the parties, letters addressed to litigants from third persons, and hearsay which does not fall under one or more of the exceptions

3

listed in Rules 803-805 of the Federal Rules of Evidence, may not properly be considered. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Beyene v. Coleman Security Service, Inc.,* 854 F.2d 1179 (9th Cir. 1988); *Edward B. Marks Music Corp. v. Stasny Music Corp.,* 1 F.R.D. 720 (S.D.N.Y. 1941).

## ARGUMENT

I.    **THE DEFENDANTS ARE ENTITLED TO JUDGMENT IN THEIR FAVOR ON THE PLAINTIFF'S CLAIM FOR VIOLATION OF HER RIGHTS UNDER THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION.**

The Fourteenth Amendment to the United States Constitution declares that "no State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1. The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 439, 87 L.Ed.2d 313, 105 S.Ct. 3249 (1985*). See also, Smith v. U.S. Parole Commission,* 814 F.Supp. 246, 247 (D.Conn. 1993) (The essence of equal protection is that persons similarly situated with respect to challenged government action shall be treated similarly). Of course, the government can treat persons differently if they are not "similarly situated." *Able v. United States,* 155 F.3d 628, 631 (2d Cir. 1998). The Fourteenth Amendment does not provide that all people must be treated identically. *Smith, supra,* 814 F.Supp. at 247, *citing Lombard v. Board of Education of the City of New York,* 645 F. Supp. 1574, 1581 (E.D.N.Y. 1986).

The Supreme Court made clear in *Village of Willowbrook v. Olech,* 528 U.S. 562, 145 L.Ed.2d 1060, 120 S.Ct. 1073 (2000), that a party can bring an equal protection claim by alleging it has "been intentionally treated differently from others similarly situated and that there is no

4

rational basis for the difference in treatment." *Id.* at 564. When determining whether a particular government action violates the Equal Protection Clause, a court generally considers whether the disparate classification at issue bears some rational relationship to a legitimate government interest. Only when the challenged classification infringes upon a fundamental right or is directed at a suspect class does the court apply a stricter level of review. *See Phyler v. Doe,* 457 U.S. 202, 216-18, 102 S.Ct. 2382, 2394-95, 72 L.Ed.2d 786 (1982); *New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2516, 49 L.Ed.2d 511 (1976).

While the prototypical equal protection claim involves discrimination against people based on their membership in a vulnerable class, our courts have long recognized that the equal protection guarantee also extends to individuals who allege no specific class membership but are nonetheless subjected to invidious discrimination at the hands of government officials. *E. g., LeClair v. Saunders,* 627 F.2d 606, 608-10 (2d Cir. 1980). The Supreme Court recently affirmed the validity of such "class of one" claims "where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech,* 528 U.S. 562, 564, 145 L.Ed.2d 1060, 120 S.Ct. 1073 (2000) (per curiam).

There are several ways for a plaintiff to plead intentional discrimination that violates the Equal Protection Clause. A plaintiff could point to a law or policy that "expressly classifies persons on the basis of race" or some other prohibited basis for discriminatory treatment. *Id.* (citing *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 213, 227-29, 132 L.Ed.2d 158, 115 S.Ct. 2097 (1995)). Or a plaintiff could identify a facially neutral law or policy that has been applied in an intentionally discriminatory manner. *See Yick Wo v. Hopkins,* 118 U.S. 356, 373-

5

74, 30 L.Ed. 220, 6 S.Ct. 1064 (1886).  A plaintiff could also allege that a facially neutral statute

or policy has an adverse effect and that it was motivated by discriminatory animus.  *See Village*

*of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 264-65, 50

L.Ed.2d 450, 97 S.Ct. 555 (1977); *Johnson v. Wing*, 178 F.3d 611, 615 (2d Cir. 1999).

  When pleading a violation of the Equal Protection Clause on the basis of the second

theory -- *i.e.,* that the defendants unlawfully applied a facially neutral law or policy to the

plaintiff in a discriminatory manner without a rational basis for so doing -- the courts engage in a

two-step analysis to determine whether a plaintiff has properly alleged a cause of action.  First,

the court must determine from the pleadings whether it can adequately identify the group with

which the plaintiff claims to be similarly situated.  Only after the group to which the plaintiff is

similarly situated has been identified can it then be determined whether the complaint

sufficiently pleads disparate or discriminatory treatment absent a rational basis in violation of the

Equal Protection Clause -- the second criteria.[1]  *See, e.g., Congregation Kol Ami v. Abington*

*Twp.*, 2002 U.S. App. LEXIS 21541, slip op. at 41-42 (3rd Cir. 2002), *citing City of Cleburne,*

*supra,* 473 U.S. at 447-50.  This is the test adopted by the Second Circuit.[2]  *See Jankowski-*

---

[1]  For example, if a plaintiff seeks to prove selective prosecution on the basis of his race, he "must show that similarly situated individuals of a different race were not prosecuted."  *United States v. Armstrong,* 517 U.S. 456, 465, 134 L.Ed.2d 687, 116 S.Ct. 1480 (1996).  It is not necessary to plead the existence of a similarly situated non-minority group when challenging a law or policy that contains an express, racial classification.  *Brown, supra,* 221 F.3d at 337.  These classifications are subject to strict judicial scrutiny, *see Able v. United States,* 155 F.3d 628, 631-32 (2d Cir. 1998), and strict scrutiny analysis in effect addresses the question of whether people of different races are similarly situated with regard to the law or policy at issue.  This does not avail the plaintiff in this case, however, because he has not identified any law or policy that contains an expressly prohibited classification.

[2]  Other courts have tracked the two-step analysis laid out in *City of Cleburne,* determining first if the uses are "similarly situated" and, if they are, only then asking if there is a rational basis for distinguishing between them.  In *Cornerstone Bible Church v. Hastings,* 948 F.2d 464 (8th Cir. 1991), the Eighth Circuit relied on *City of Cleburne* and required the city to provide a rational basis for the "apparent unequal treatment of similarly situated entities" only after first concluding that the church was similarly situated to permitted uses in a commercial zoning district.  *Id.,* 948 F.2d at 472.  Similarly, in *Christian Gospel Church v. San Francisco,* 896 F.2d 1221 (9th Cir. 1990), a

*Burczyk v. INS,* 291 F.3d 172, 176 (2nd Cir. 2002). *See also, Brown v. City of Oneonta,* 221 F.3d 329, 337 (2nd Cir. 1999), *reh. denied,* 235 F.3d 769 (2nd Cir 2000); *Hayden v. County of Nassau,* 180 F.3d 42, 48 (2nd Cir. 1999).

Here, the plaintiff has failed to establish the equal protection cause of action with sufficient particularity to pass the test adopted by the Second Circuit. While the instant Amended Complaint contains an allegation that "all of the defendants … have thereby deprived the plaintiffs of equal protection of the laws by treating them differently from similarly situated landowners without any rational basis for the said discrimination," *see* Amended Complaint, ¶ 11, it fails to describe with any degree of particularity just what the group of "similarly situated landowners" actually is. While this allegation may be "sufficient, albeit barely, to meet the minimal level established by *Olech* for "class of one" equal protection claims at the pleading stage," *see DeMuria v. Kawkes,* 328 F.3d 704, 707 (2d Cir. 2003), it is not sufficient with which to withstand a motion for summary judgment. Id., at 708. As recognized in *DeMuria,* the plaintiffs now face a significant hurdle in identifying similarly situated persons, and in proving the actions of the defendants to have been irrational so as to withstand summary judgment. Absent such evidence, the plaintiff's equal protection claim is doomed to failure.

Even if the plaintiff had met the first prong of the equal protection test, she has failed to establish that the State Police defendants acted irrationally in addressing her situation. Absent any reliable proof as to the extent of the plaintiff's ownership rights to the property in question, it cannot be said that a rational basis for the troopers' refusal to stop the plaintiff's neighbors from

---

church sought a permit to build a church in an area zoned for single-family residences. The Court stated that "in order to prevail, the Church must make a showing that a class that is similarly situated has been treated disparately." *Id.* at 1225.

crossing Lot 14A on Woodland Acres Road is lacking.  Accordingly, judgment must be issued in favor of the State Police defendants on the plaintiffs' equal protection claim.

## II.     THE DEFENDANTS ARE ENTITLED TO JUDGMENT ON THEOR FAVOR ON THE PLAINTIFF'S PROCEDURAL DUE PROCESS CLAIM UNDER THE FOURTEENTH AMENDMENT.

The Due Process Clause of the Fourteenth Amendment provides, at a minimum, three different types of constitutional protections.  It incorporates and makes applicable to the states specific protections embodied in the Bill of Rights; it guarantees a right to what has been termed "'substantive due process' which bars certain arbitrary government actions 'regardless of the fairness of the procedures used to implement them;'" and it provides a right to "procedural due process," in providing a constitutionally-required minimum of procedural safeguards in connection with a deprivation of life, liberty or property by the State.  *Daniels v. Williams,* 474 U.S. 327, 337, 106 S.Ct. 662, 667, 88 L.Ed.2d 662 (1986) (Stevens, J., concurring); *see also, Temkin v. Frederick County Commissioners,* 945 F.2d 716, 720 n.4 (4th Cir. 1991), *cert. denied,* 502 U.S.1095, 112 S.Ct. 1172, 117 L.Ed.2d 417 (1992).  Here, we are concerned only with claims regarding alleged violations of the plaintiff's right to procedural due process.

Pursuant to the Due Process Clauses of the Fourteenth Amendment, neither the states nor the federal government may deprive an individual of property or liberty without due process.  In order to state a valid procedural due process claim, the plaintiff must demonstrate: (1) that she had a property interest; (2) of which the defendants deprived her; (3) without due process of law.  *Weinstein v. Albright,* 261 F.3d 127, 134 (2d Cir. 2001); *Sylvia Dev. Corp. v. Calvert County*, 48 F.3d 810, 826 (4th Cir. 1995).  It is well-settled that the Fourteenth Amendment itself does not create property interests. "Rather, they are created and their dimensions are defined by existing

8

rules or understandings that stem from an independent source such as state law." *Board of Regents v. Roth*, 408 U.S. 564, 577, 33 L.Ed.2d 548, 92 S.Ct. 2701 (1972). Further, to have a property interest in a benefit, a person must have a "legitimate claim of entitlement to it." *Id.* A mere "abstract need or desire for it" or "a unilateral expectation of it" is insufficient. *Id.*

Due process of law generally requires that a deprivation of property "be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313, 94 L.Ed. 865, 70 S.Ct. 652 (1950). *See also, Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 542, 84 L.Ed.2d 494, 105 S.Ct. 1487 (1985). However, "to determine whether a procedural due process violation has occurred, courts must consult the entire panoply of pre-deprivation and post-deprivation process provided by the state. *Fields v. Durham,* 909 F.2d 94 (4th Cir. 1990), *cert. denied,* 498 U.S. 1068, 112 L.Ed.2d 849, 111 S.Ct. 786 (1991), *citing Zinermon v. Burch*, 494 U.S. 113, 126, 108 L.Ed.2d 100, 110 S.Ct. 975 (1990). A "due process violation actionable under § 1983 is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process." *Fields*, 909 F.2d at 98 (quoting *Zinermon*, 494 U.S. at 126).

Where the plaintiff's claim is one of a denial of procedural due process, the Due Process Clause of the Fourteenth Amendment usually requires a pre-deprivation hearing when the loss of property or liberty results from established state procedures. *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 71 L.Ed.2d 265, 102 S.Ct. 1148 (1982). A pre-deprivation process cannot reasonably be required, however, where loss results from a random, unauthorized act of an employee who is a state actor. *Parratt v. Taylor,* 451 U.S. 527, 68 L.Ed.2d 420, 101 S.Ct. 1908 (1981), *overruled on other grounds, Daniels v. Williams,* 474 U.S. 327, 88 L.Ed.2d 662, 106

S.Ct. 662 (1986); *Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). The Supreme Court thus distinguishes between deprivations of liberty or property occurring as a result of established governmental procedures, and those based on random, unauthorized acts by government officers. *See Parratt,* 451 U.S. at 541. Under the latter scenario, a deprivation effectuated through the random and unauthorized acts of government officials does not violate procedural due process so long as the government provides a meaningful remedy subsequent to the deprivation. *See Hudson,* 468 U.S. at 531-32. The rationale for this principle is plain: because the challenged misconduct is random and unauthorized, it is impossible for the government to anticipate and prevent the wrongful loss of liberty or property in advance, and it has no realistic alternative other than to adopt remedies capable of righting the wrong after the deprivation. *Id.,* at 532; *Parratt,* 451 U.S. at 541. In such an event, due process is satisfied by the availability of adequate post-deprivation remedies. *Id.* at 541. The analysis turns on whether the alleged deprivation is foreseeable and will occur at a predictable point, such that pre-deprivation safeguards would be of use in preventing the kind of deprivation alleged. *Zinermon v. Burch, supra.*

In *Zinermon,* the Supreme Court clarified the meaning of "unauthorized," explaining that where a state "delegate[s] to [the defendants] the power and authority to effect the very deprivation complained of[,] and also delegate[s] to them the concomitant duty to initiate the procedural safeguards set up by state law to guard against unlawful [deprivation]," abuse of that authority is not considered "random and unauthorized" as that phrase is used in *Parratt* and *Hudson. Zinermon,* 494 U.S. at 138. Given the nature of the instant dispute, it can hardly be expected that the plaintiff should have been afforded a pre-deprivation hearing before the

10

troopers took action on the complaints regarding Lot 14A. The defendants were called to the

scene of an ongoing property dispute with no prior knowledge of the problem and limited

information as to the competing rights of the parties. As recognized by Lieutenant Tolomeo, the

determination of competing claims to the right to use Woodland Acres Road where it crossed Lot

14A was beyond the expertise of the State Police. In order to preserve public safety, however,

they were nonetheless required to take some action - even if it was only to preserve the status

quo while the parties sought a more permanent remedy in the state courts.

On the other hand, there exist adequate and appropriate post-deprivation state remedies

whereby the plaintiff is able to gain redress for any perceived wrongdoing on the part of the State

Police defendants. To begin with, once it was made clear that the extent of the plaintiff's claim

to Lot 14A was unclear, the plaintiff had the right under Connecticut common law to file a quiet

title action in Superior Court in order to clarify the extent of her property interest. *See, e.g.,*

*Tadros v. Middlebury Medical Center, Inc.,* 263 Conn. 235, 820 A.2d 230 (2003); *Schwartz v.*

*Murphy,* 74 Conn.App. 286, 812 A.2d 87 (2002). In fact, the plaintiff filed such an action which

remains pending. Further, if the plaintiff felt that the State Police deprived her of her rights in

the course of performing their official duties, she had the right to sue the State of Connecticut

under Chapter 53 of the Connecticut General Statutes. *See* Conn. Gen. Stat. § 4-166 *et seq.*

Accordingly, judgment must be issued in favor of the State Police defendants on the plaintiffs'

procedural due process claim.

**III.    THE DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY FOR
        THEIR ACTIONS AS ALLEGED IN THE PLAINTIFF'S COMPLAINT.**

The shield of qualified immunity generally protects government officials from liability

for damages on account of their performance of discretionary official functions "insofar as their

11

conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *LaBounty v. Coughlin,* 137 F.3d 68, 73 (2d Cir. 1998). The availability of the defense turns upon the "objective legal reasonableness" of the allegedly unlawful official action, "assessed in light of the legal rules that were clearly established at the time it was taken." *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987) (quoting *Harlow v. Fitzgerald,* 457 U.S. at 818-19, 102 S.Ct. at 2739). *See also, Glass v. Mayas,* 984 F.2d 55, 57 (2d Cir. 1993). The qualified immunity defense is intended to "strike a fair balance between (1) the need to provide a realistic avenue for vindication of constitutional guarantees, and (2) the need to protect public officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." *Lee v. Sandberg,* 136 F.3d 94, 100 (2d Cir. 1997) (citations omitted). The rule serves to protect government officials from charges that they knowingly violated standards that were in fact unknowable." *Havekost v. U.S. Dept. of Navy,* 925 F.2d 316 (9th Cir. 1991) (citations omitted).

Because qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation," where the defendant seeks qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive. *Saucier v. Katz,* 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 252 (2001), *citing Mitchell v. Forsyth,* 472 U.S. 511, 526, 86 L.Ed. 2d 411, 105 S. Ct. 2806 (1985). The privilege is "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Id.,* 533

12

U.S. at 201.  As a result, the Court has repeatedly stressed the importance of resolving immunity

questions at the earliest possible stage in litigation.  *Id., citing Hunter v. Bryant,* 502 U.S. 224,

227, 116 L. Ed. 2d 589, 112 S. Ct. 534 (1991) *(per curiam).*

       In a suit against an officer for an alleged violation of a constitutional right, the requisites

of a qualified immunity defense must be considered in proper sequence.  According to *Saucier*, a

court required to rule upon the qualified immunity issue must first consider this threshold

question: Taken in the light most favorable to the party asserting the injury, do the facts alleged

show the officer's conduct violated a constitutional right?  *Id., citing Siegert v. Gilley,* 500 U.S.

226, 232, 114 L. Ed. 2d 277, 111 S. Ct. 1789 (1991).  As explained by the Court in *Saucier,*

> In the course of determining whether a constitutional right was
> violated on the premises alleged, a court might find it necessary to
> set forth principles which will become the basis for a holding that a
> right is clearly established. This is the process for the law's
> elaboration from case to case, and it is one reason for our insisting
> upon turning to the existence or nonexistence of a constitutional
> right as the first inquiry.  The law might be deprived of this
> explanation were a court simply to skip ahead to the question
> whether the law clearly established that the officer's conduct was
> unlawful in the circumstances of the case.

*Id.,* 533 U.S. at 201.

       If no constitutional right would have been violated were the allegations established,

*Saucier* instructs that there is no necessity for further inquiries concerning qualified immunity.

On the other hand, if a violation could be made out on a favorable view of the parties'

submissions, the next, sequential step is to ask whether the right was clearly established.  *Id.,* 501

U.S. at 201.  This inquiry, it is vital to note, must be undertaken in light of the specific context of

the case, not as a broad general proposition; and it too serves to advance understanding of the

law and to allow officers to avoid the burden of trial if qualified immunity is applicable.  As

13

more fully articulated by the U.S. Supreme Court in *Hope v. Pelzer,* 536 U.S. 730, 122 S.Ct.

2508, 153 L.Ed.2d 666 (2002),

> Qualified immunity operates to ensure that before they are
> subjected to suit, officers are on notice that their conduct is
> unlawful. For a constitutional right to be clearly established, its
> contours must be sufficiently clear that a reasonable official would
> understand that what he is doing violates that right. This is not to
> say that an official action is protected by qualified immunity unless
> the very action in question has been held unlawful, but it is to say
> that in the light of pre-existing law the unlawfulness must be
> apparent.

*Id.,* 536 U.S. at 739, (internal citations and quotations omitted). The relevant, dispositive inquiry

in determining whether a right is clearly established is whether it would be clear to a reasonable

officer that his conduct was unlawful in the situation he confronted. *Saucier v. Katz, supra.* If

the law did not put the officer on notice that his conduct would be clearly unlawful, judgment

based on qualified immunity is appropriate. *Id.*

Of course, there is no definitive guide as to when a right is clearly established. Thus,

while the defendants do not question the existence of a suspect's Fourth Amendment right to be

free from unreasonable seizure generally,

> the relevant inquiry is not whether the defendants should have
> known that there was a federal right, in the abstract ..., but whether
> the defendants should have known that the specific actions
> complained of violated ... [that right]. Such an inquiry requires
> that a court define the constitutional right with some specificity. If
> the right is defined too broadly, plaintiff would be able to convert
> the rule of qualified immunity ... into a rule of virtually unqualified
> liability simply by alleging violation of extremely abstract rights.

*Lewis v. Cowen,* 165 F.3d 154, 167 (2d Cir. 1999) (internal quotations and citations omitted). In

the absence of controlling precedent, decisions from other circuits must both point unmistakably

to the unconstitutionality of the conduct complained of and be so clearly foreshadowed by

14

applicable direct authority as to leave no doubt in the mind of a reasonable officer that his

conduct, if challenged on constitutional grounds, would be found wanting. *Marsh v. Arn,* 937

F.2d 1056, 1068 (6th Cir. 1991) (citations omitted).[3]

Assuming that the factual allegations in a particular case demonstrate that there exists an

underlying constitutional right, and that this right was clearly established in a particularized

sense at the time the defendants acted, the final inquiry which must be undertaken in the

qualified immunity analysis is the question of whether, despite the nature of the constitutional

right at issue, a reasonable officer could have been mistaken as to the legal constraints upon his

conduct. If such a mistake as to the legal constraints upon his conduct was objectively

reasonable, the defendant is nonetheless entitled to qualified immunity.

> The concern of the immunity inquiry is to acknowledge that
> reasonable mistakes can be made as to the legal constraints on
> particular [governmental] conduct. It is sometimes difficult for an
> [official] to determine how the relevant legal doctrine [...] will
> apply to the factual situation the [official] confronts. If the
> [official's] mistake as to what the law requires is reasonable,
> however, the [official] is entitled to the immunity defense.

*Saucier v. Katz, supra. See also, Malley v. Briggs,* 475 U.S. 335, 343, 89 L.Ed.2d 271, 106 S.Ct.

1092 (1986) (qualified immunity leaves ample room for mistaken judgments). Thus, qualified

immunity protects "all but the plainly incompetent or those who knowingly violate the law, or

those who act where "the law clearly proscribed the actions" taken." *Saucier, supra,* (quoting

*Anderson v. Creighton,* 483 U.S. at 638-39). This aspect of the doctrine of qualified immunity

---

[3]   As stated by the Second Circuit in *Poe v. Leonard,* 282 F.3d 123 (2nd Cir. 2002), "[i]t is unclear the extent to
which we may rely on the case law of other circuits to determine whether the law was clearly established." *Id.,* 282
F.3d at 141, n. 15. Accordingly, in those cases where the Second Circuit has relied upon the law established in other
circuits as a guide for its own legal analysis, it has done so only where our precedent had foreshadowed the
development of the relevant standards that other circuits had clearly established. *Id., citing Varrone v. Bilotti,* 123
F.3d 75 (2d Cir. 1997).

15

recognizes that law enforcement officers are only human, and inevitably, accidents and mistakes

of judgment will happen. Such mistakes alone do not open officers to personal liability. *Wren v.*

*Towe,* 130 F.3d 1154, 1159 (5th Cir. 1997), *cert. denied,* 525 U.S. 815, 142 L. Ed. 2d 40, 119 S.

Ct. 51 (1998); *accord, Pritchett v. Alford,* 973 F.2d 307, 313 (4th Cir. 1992) ( indicating that

qualified immunity affords tolerance for mistakes of judgment traceable to unsettled law, faulty

information, or contextual exigencies). Accordingly,

> In cases involving the conduct of police officials, ... even where
> the plaintiff's federal rights and the scope of the official's
> permissible conduct are clearly established, the qualified immunity
> defense protects a government actor if it was "objectively
> reasonable" for him to believe that his actions were lawful at the
> time of the challenged act . . . . The objective reasonableness test
> is met - and the defendant is entitled to qualified immunity - if
> officers of reasonable competence could disagree on the legality of
> the defendant's actions . . . . In qualified immunity cases, we are
> not concerned with the correctness of the defendants' conduct, but
> rather with the "objective reasonableness" of their chosen course of
> action given the circumstances confronting them at the scene . . . .
> [W]hen the factual record is not in serious dispute . . . [t]he
> ultimate legal determination whether . . . a reasonable police
> officer should have known he acted unlawfully is a question of law
> better left for the court to decide.

*Lennon v. Miller,* 66 F.3d 416, 420-21 (2d Cir. 1995) (quotations and internal citations omitted);

*accord, Oliviera v. Mayer,* 23 F.3d 642, 649 (2d Cir. 1994), *cert. denied,* 513 U.S. 1076, 115

S.Ct. 721, 130 L.Ed.2d 627 (1995) (immunity ordinarily should be decided by the court in those

cases where the facts concerning the availability of the defense are undisputed).

The Supreme Court's standard of reasonableness is comparatively generous to the police

in cases where potential danger, emergency conditions or other exigent circumstances are

present. *Roy v. Inhabitants of the City of Lewiston,* 42 F.3d 691, 695 (1st Cir. 1994). For

example, in *Graham v. Connor,* 490 U.S. 386 (1989), the Court said that the "calculus of

16

property rights on Lot 14A so as to make the refusal of the defendants to enforce the plaintiff's claims arguably reasonable. Any conflict over the question of whether the troopers threatened to arrest the plaintiff at one time or another if she did not remove the chain from across Woodland Acres Road is simply not material to a determination of the constitutional claims. The fact is that the plaintiff was never arrested, the intrusions across her property were, at best, minimal, and the extent of her rights to Lot 14A remain, to this day, unresolved. Analysis of the facts of this case establishes that, in the absence of definitive guidance from the courts of this circuit, at its worst, reasonable officers could differ as to what action should have been taken, and as to whether the actions, in fact, taken by the defendants were appropriate under the totality of the circumstances known to them at the time. Accordingly, the defendants are entitled to qualified immunity for their actions relative to the instant litigation as articulated in the plaintiff's complaint.

## IV.  THE DEFENDANTS ARE ENTITLED TO JUDGMENT IN THEIR FAVOR ON THE PLAINTIFF'S CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.

It is well settled that, in order to state a claim of intentional infliction of emotional distress, "[i]t must be shown: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." *Petyan v. Ellis,* 200 Conn. 243, 253, 510 A.2d 1337 (1986) (Internal quotation marks omitted). Whether the defendant's conduct and the plaintiff's resulting distress are sufficient to satisfy either of these elements is a question, in the first instance, for the court. Only where reasonable

18

minds can differ does the question become an issue for the jury to decide. *Id.* (quoting *Mellaly v. Eastman Kodak Company,* 42 Conn. Sup. 17, 18, 597 A.2d 807 (1991).

Extreme and outrageous conduct is an essential element in the tort of intentional infliction of emotional distress. Mere insults, indignities, or annoyances that are not extreme and outrageous will not suffice. *Biro v. Hirsch,* Docket No. CV0314442S, 1998 WL 59499 (Conn. Super. 1998), slip op. at 6 (citations omitted). Liability for intentional infliction of emotional distress requires conduct exceeding all bounds usually tolerated by decent society, of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind. *DeLaurentis v. New Haven,* 220 Conn. 225, 267, 597 A.2d 807 (1991).

One Connecticut Superior Court decision provided a useful analysis of cases from Connecticut and other jurisdictions which employ the same standard:

> . . . For the tort of intentional infliction of emotional distress to be established, . . . the plaintiff must allege and prove conduct considerably more egregious than that experienced in the rough and tumble of life .... Liability exists only for conduct exceeding all bounds usually tolerated by decent society, of a nature which is especially calculated to cause, and does cause mental distress of a very serious kind. [A] line can be drawn between the slight hurts which are the price of a complex society and the severe mental disturbances inflicted by intentional actions wholly lacking in social utility. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.
>
> Some courts called upon to determine whether there is a reason to let a jury decide whether alleged conduct could be found to meet "outrageous" standard have focused on objective criteria such as whether the defendant was in a position of authority over the plaintiff. Some cases have focused on whether the defendant knew of some special susceptibility to emotional abuse on the part of the plaintiff. Some cases have looked to whether there is a lengthy or continuous pattern of harassment conduct over time. Single

19

> incidents, even if false accusations, are almost never found by
> courts to be outrageous. In *Whelan v. Whelan,* 41 Conn. Sup. 519
> (1991), what may have been a single incident was held sufficient to
> show outrageousness, but that case does involves a falsehood
> designed to instill fear of death. It is distinguishable on these facts.
> This matter does not fall into any fact pattern or category
> previously deemed outrageous. The actions here do not go
> "beyond all possible bounds of decency."

*Lucas v. Firine,* No. CV 92-0335703, 1993 Conn. Super. LEXIS 1777 (1993).

Finally, the conduct, although it would otherwise be extreme and outrageous, may be

privileged under the circumstances. The actor is never liable, for example, where he has done no

more than to insist upon his legal rights in a permissible way, even though he is well aware that

such insistence is certain to cause emotional distress. *Brown v. Ellis,* 40 Conn. Sup. 165, 168,

484 A.2d 944 (1984), *citing,* Restatement (Second) of Torts § 46, comment g.

For all of the reasons citied in support of qualified immunity above, the actions of the

defendants in this case were not so extreme or outrageous as to support a claim for intentional

infliction of emotional distress in violation of Connecticut common law. Accordingly, judgment

should be granted in favor of the defendants on this claim as well.

## IV.    THE PLAINTIFF'S STATE LAW CLAIMS SHOULD BE DISMISSED.

Putting aside, for the moment, the defendants' request that judgment be issued in their

favor on the merits of the Connecticut common law claim, to the extent that such judgment is not

issued, the plaintiff's remaining state law claims should be dismissed pursuant to 28 U.S.C. §

1367(c)(3). Section 1367(c)(3) provides that a district court may decline to exercise

supplemental jurisdiction over a claim under subsection (a) if "the district court has dismissed all

claims over which it has original jurisdiction." As the Practice Commentary following 28

U.S.C.A. § 1367 notes, in this situation, judicial discretion is "a particularly important element.

Here, the 'may' in 'may decline' has a major role to play." Commentary at p. 835. The Commentary goes on to state that the district court, in exercising its discretion, should undertake a "case-specific analysis," considering such factors as the point in the litigation when the main claim is dismissed.

Justice Brennan, in the well-known case of *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), stated that principles of comity, federalism, and the interests of justice dictate that needless decisions of state law should be avoided. Under *Gibbs,* a federal district court should consider and weigh in each case the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case involving pendent state-law claims. *Gibbs* suggested strongly that, if federal claims are dismissed before trial, the state claims should also be dismissed. *Id.,* 383 U.S. at 726-27, 86 S.Ct. at 1138. *See also, Carnegie-Mellon University v. Cohill,* 484 U.S. 343, 350, 108 S.Ct. 614, 619, 98 L.Ed.2d 720 (1988); 3A Moore's Federal Practice ¶ 18.02 {4.2} at 18-22; *Pitchell v. Callan,* 13 F.3d 545 (2d Cir. 1994). Indeed, the Second Circuit has made clear that, where the federal claims are dismissed prior to trial, declining to exercise jurisdiction over the state claims is the preferred course of action. *See, e.g., DiLaura v. Power Authority of New York,* 982 F.2d 73 (2d Cir. 1992). Thus, where a plaintiff pleads a federal cause of action and derivative state law claims in the same complaint, the state law claims cannot survive a finding that the federal law claims are legally insufficient. *See Monsky v. Moraghan,* 127 F.3d 243, 247 (2d Cir. 1997); *Lennon,* 66 F.3d at 426 (Having dismissed the plaintiff's underlying federal claims, we also dismiss her supplemental state claims of assault, unlawful imprisonment, and malicious prosecution); *A. Aiudi & Sons v. Plainville,* 862 F. Supp. 737, 745 (D. Conn. 1994) (dismissal of

21

claim arising under federal law obliterated court's subject matter jurisdiction over state law claims).

## CONCLUSION

For all of the foregoing reasons, judgment should be issued in favor of the below named defendants in this matter.

DEFENDANTS
Trooper David Laboy, Trooper Hazen,
Trooper Sweeney, and Lieutenant Tolomeo

RICHARD BLUMENTHAL
ATTORNEY GENERAL

By: _____
Stephen R. Sarnoski
Assistant Attorney General
MacKenzie Hall
110 Sherman Street
Hartford, Connecticut 06105
Tel. (860) 808-5450
Federal bar #ct05129
E-mail: stephen.sarnoski@po.state.ct.us

22