UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

Lorraine LONGMOOR, and :
    Lyndsey KEENE, :
    plaintiffs, :
     :
v. : No. 3:02cv1595 (JBA)
     :
Karl NILSEN, Michael FOX, :
Town of BARKHAMSTED, :
BARKHAMSTED Inland Wetlands :
Commission, Trooper David :
LABOY, Trooper HAZEN, :
Trooper SWEENEY, LT. TOLOMEO, :
and P-J'S AUTO SERVICE, Inc., :
Defendants. :

Ruling on Defendant P-J's Auto Service, Inc.'s Motion for Summary
Judgment [Doc. #58-1] and Attorney's Fees [Doc. #58-2] and
Plaintiffs' Motion to Strike [Doc. #55]

Defendant P-J's Auto Service, Inc. ("P-J's") moves pursuant to Fed. R. Civ. P. 56 for summary judgment on plaintiffs' civil rights claims under 42 U.S.C. § 1983 on the grounds that its towing of plaintiff Lorraine Longmoor's automobile on February 17, 2000 in the presence of Connecticut State Police officers did not constitute state action, and on plaintiffs' state law claim of intentional infliction of emotional distress for failure of a triable factual issue on the tort's essential elements. Further, P-J's asserts that the frivolous nature of plaintiffs' civil rights claims entitles it to attorneys' fees pursuant to 42 U.S.C. § 1988(b). The Court agrees that there is no triable issue of fact with respect to plaintiffs' claims, that they became objectively unreasonable prior to the filing of P-J's

1

preventing delivery of the modular home to Langer's lot across her property. Longmoor's car only partially obstructed access, leaving enough room for an automobile to drive in and out but not enough room for the tractor trailer with the modular home.

While the exact chronology of what occurred next is not clearly delineated in the summary judgment record, it appears that Longmoor remained in her automobile, two state police officers, including Trooper Bement, were called to the scene, and Langer began to make plans to have Longmoor's vehicle towed from blocking the tractor trailer's access. At this point, apparently plaintiff Keene and an unidentified individual arrived on the scene and heard the State Police officers inform Longmoor that her automobile was going to be towed. See Keene Depo. (06/03/2003) at 51:19-23.[2] Keene incorrectly deduced from the officers' statement that the State Police had called for the tow.

It is undisputed that it was Langer who telephoned Spaziani, requesting that P-J's tow the vehicle that was blocking Woodland Acres Road and preventing him from obtaining access to his property. Spaziani, responding to Langer's request, proceeded in his tow truck to Woodland Acres where he was met by Langer and Langer's father, Dick Langer. He observed Longmoor's car parked in the road blocking access to Langer's land, and two Connecticut

---

[2] "[W]hen we went up to the chain or gate, whatever you want to call it, there were State Police there, and they informed Lorraine that her car was going to be towed."

State Police officers, including Trooper Bement. Spaziani inquired of Trooper Bement as to whether he would be arrested if he towed Longmoor's automobile. Trooper Bement "told [Spaziani] that [he] could not order [Spaziani] to tow the car and that the towing of the car was between [Spaziani] and Mr. Langer, who called P-J's to tow the car. [Trooper Bement] informed [Spaziani] that [he] was there for public safety and to keep the peace." Bement Aff. ¶ 8.[3] During this discourse, Longmoor appears to have remained in her automobile, and Spaziani says she was within earshot when Trooper Bement stated that he could not order Spaziani to tow the vehicle. See Supp. Spaziani Aff. ¶ 4.

At some point, Longmoor got out of her car, prompted by either Trooper Bement or the other unidentified State Police officer. Next, Bill Langer directed Spaziani to tow Longmoor's car. Spaziani did not ask for or receive assistance from the State Police officers. Spaziani asked Longmoor in the presence of Bill Langer, Dick Langer, and Officer Bement for the keys to her automobile in order to facilitate the towing. Spaziani says Longmoor freely and willingly turned the keys over to him. By affidavit, Longmoor contradicts this account: "I turned those keys over to Mr. Spaziani under threat that if I did not surrender my keys to him my car would be damaged. In my presence

---

[3] This statement is consistent with Spaziani's account, see Spaziani Aff. ¶ 4 ("[Trooper Bement] viewed it to be a matter for the civil courts and not a police matter"), and Bement's own statement of purpose, see Bement Aff. ¶ 5 ("My sole purpose was to assure public safety and maintain the peace.").

4

and his, two state troopers stated that my car was going to be towed whether I surrendered my keys or not." Longmoor Aff. ¶ 4. Longmoor's affidavit account, specifically her characterization of a "threat" and account of what the two State Police officers said, gives a very different spin on her earlier vague and milder deposition version of events: "I don't recall the exact conversation, but in essence, if I was to leave my car where it was on the road locked up that it was going to be towed and that towing a car that's locked and in gear can possibly do damage to the vehicle. So when I was informed of that, I handed the keys. I didn't want my vehicle damaged, but yet I did not want it towed." Longmoor Depo. (03/26/2003) at 196:11-18; see also id. at 199:21-24;[4] Longmoor Depo. (05/30/2003) at 417:6-14;[5] id. at 417:19-22.[6] No offensive conduct occurred between Spaziani and Longmoor, and, while Woodland Acres Road was marked with a "no trespassing" sign, the record is undisputed that Longmoor did not inform Spaziani that he was trespassing on her property or that

---

[4] "I don't recall the conversation on what Trooper Bement told me on that day."

[5] "Not that I can recall specifically. My conversation, what I said, I do know that one of the officers, State Police troopers, that was there told me that if I left my car locked and in gear on this hillside - - I am on a hill - - and that they were going to tow my car that physical damage could be - - could happen to my car because it was towed in a locked condition in gear."

[6] "But I was told, like I said, that physical damage to the car could happen if it was towed when it was in gear, and that's why I handed the keys to the person with the tow truck."

5

her vehicle was parked on her property.[7]

Spaziani towed Longmoor's vehicle seven hundred feet to the driveway to her house. Longmoor admits that the State Police did not order P-J's to tow her car. See Longmoor Depo. (03/26/2003) at 193:3-4. Instead, her claim of delict is: "Mr. Spaziani and Mr. Langer trespassed on my property and seized my car, without my consent, under the eyes of two state troopers who permitted them to do so." Longmoor Aff. ¶ 5. Similarly, plaintiff Keene also acknowledged that the State Police officers did not call P-J's or order it to tow Longmoor's vehicle, but believed P-J's was acting under the specific direction of the Connecticut State Police "[b]ecause [he] believe[s] the State Police were there, that P-J's towed that car in front of the police, and the police and P-J's are both attributable," Keene Depo. (06/09/2003) at 13:13-16, even though he believed that P-J's "absolutely" would have towed Longmoor's car even if the State Police had not been present, see id. at 15:4-14.

After the tow, Spaziani left, and the mobile home was delivered to Langer's property on the tractor trailer. Trooper Bement sums up the interaction as: "Everything was cordial. There was no hostility between any of those present. In fact I stated how nice it was that everyone was getting along so well."

---

[7] Also prior to the towing, Keene asked Trooper Bement what would happen if the car was damaged while it was towed, and Trooper Bement responded that it would be a civil matter.

Bement Aff. ¶ 11.

## II.  Summary Judgment Standard

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Where, as here, a party moves for summary judgment against claims on which the non-moving party bears the burden of proof at trial, the moving party still shoulders the initial responsibility to inform the district court of the basis for its motion, namely, to identify those portions of the court or discovery record together with affidavits, if any, believed to demonstrate the absence of a genuine issue of material fact on an essential element of the non-moving party's claim. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986). The non-moving party must then go beyond the pleadings and by her own affidavits, or by evidentiary support found in the court or discovery record, designate specific facts establishing a genuine issue of material fact on any element essential to the non-moving party's case that was sufficiently called into question by the moving party. See id.. The "District Court must resolve any factual issues of controversy in favor of the non-moving party,"

Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990), mindful that "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). The District Court's ultimate concern is "whether there is a need for a trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250.[8]

III. Discussion

    A.    42 U.S.C. § 1983 and Private Persons

The civil rights claims of plaintiffs' amended complaint focus on procedural due process and equal protection under the Fourteenth Amendment of the United States Constitution. See Am. Compl. [Doc. #31] ¶¶ 11-16. That Amendment "is violated only 'by conduct that may be fairly characterized as 'state action.''" Barrett v. Harwood, 189 F.3d 297, 301 (2d Cir. 1999) (quoting Lugar v. Edmondson Oil Co., 457 U.S. 922, 924 (1982)). Civil

---

[8] Although plaintiffs do not move under Fed. R. Civ. P. 56(f) for a continuance of P-J's summary judgment motion to permit further discovery, they suggest that P-J's motion is premature as "[d]iscovery has not yet concluded in this case." Opp'n [Doc. #63] at 5 (unnumbered). Plaintiffs fail to mention, however, that the Court's scheduling order of January 9, 2003, explicitly required discovery regarding claims against defendant P-J's to be completed by March 10, 2003. See Order [Doc. #43].

liability under 42 U.S.C. § 1983 is imposed upon a party who "under color of state law" deprives a plaintiff of a right secured by the Constitution. "The statutory requirement of action 'under color of state law' and the 'state action' requirement of the Fourteenth Amendment are identical." Barrett, 189 F.3d at 301 (quotation omitted). Thus, to oppose P-J's motion, plaintiffs must proffer evidence sufficient to permit a trier of fact to find that P-J's acted under color of law, that is, was a state actor.

"'Private persons, jointly engaged with state officials in the prohibited action are acting 'under color' of law for purposes of [Section 1983]. To act 'under color' of law does not require that the accused be an officer of the State. It is enough that he is a willful participant in joint activity with the State or its agents.'" Ginsberg v. Healey Car & Truck Leasing, Inc., 189 F.3d 268 (2d Cir. 1999)(quoting U.S. v. Price, 383 U.S. 787, 794 (1966)).⁹ Whether a private party acts under

---

⁹ The Court recognizes that, as a general matter, factors other than participation in joint activity are relevant to whether private persons may be considered state actors:

> What is fairly attributable [to the State] is a matter of normative judgment, and the criteria lack rigid simplicity. From the range of circumstances that could point toward the State behind an individual face, no one fact can function as a necessary condition across the board for finding state action; nor is any set of circumstances absolutely sufficient, for there may be some countervailing reason against attributing activity to the government. . . .
>
> Our cases have identified a host of facts that can bear on the fairness of such an attribution. We have, for example, held that a challenged activity may be state action when it results from the State's

color of law is a fact-bound inquiry, but summary judgment is appropriate if there is no evidence to support a state actor conclusion. See id. at 271 n.1. Although not cited by either party, there are two Second Circuit cases which provide fact patterns analogous to the present summary judgment record and analysis of this case, Ginsberg, 189 F.3d 268 and Barrett, 189 F.3d 297.

### B. Ginsberg, 189 F.3d 268

The relevant facts of Ginsberg are as follows: Ginsberg rented a truck from Healey Car & Truck Leasing, Inc. When Ginsberg returned the truck one month later to the showroom, a dispute arose over payment for the rental. After heated argument between Ginsberg and Healey's manager, Gary Listorti, Michael Healey asked Ginsberg to leave because Ginsberg's disruptive behavior was disturbing customers. After Ginsberg left, Listorti called police to report the disturbance and to have an officer sent to Healey's showroom to quell any further disturbance in the

---

coercive power, ..., when the State provides significant encouragement, either overt or covert, ... , or when a private actor operates as a willful participant in joint activity with the State or its agents...."

Brentwood Academy v. Tennessee Secondary School Athletic Association, 531 U.S. 288, 295-96 (2001)(emphasis added). However, notwithstanding plaintiffs' confusion over exactly what their civil rights claims are, compare Am. Compl. [Doc. #31] ¶¶ 11-16 (clearly alleging violations of procedural and substantive due process, equal protection, and bill of attainder clause) with Opp'n [Doc. #63] at 13 (unnumbered)(failing to refer to any claims of amended complaint and suggesting plaintiffs actually maintain a Fourth Amendment claim for seizure of property without a warrant), they agree that the relevant factor/test in opposing P-J's motion for summary judgment is the joint activity one.

event Ginsberg returned. Officer John Fitzgerald came to the showroom and was informed by Listorti about Ginsberg's disruptive behavior and the rental payment dispute. Fitzgerald departed and brought Ginsberg back to the showroom, where Ginsberg and Listorti resumed their argument. Fitzgerald intervened, telling Ginsberg that he owed Healey the money for the truck rental and that he could be arrested for larceny if he did not pay. Fitzgerald also threatened to arrest Ginsberg for breach of the peace after Ginsberg persisted with loud argument. Ginsberg wrote Healey a check for $1,780.77 and left the showroom without being arrested. Ginsberg sued, claiming Healey and Fitzgerald deprived him of property without due process of law in violation of 42 U.S.C. § 1983.

The Second Circuit affirmed the district court's grant of summary judgment in favor of Healey, holding the evidence insufficient to create a genuine issue of material fact on whether Healey was a state actor: Fitzgerald's active participation in the payment dispute did not create a triable issue because the undisputed evidence showed Listorti and Healey sought police assistance to prevent further disturbance in the showroom and not to resolve the payment dispute; Listorti's description of the payment dispute to Fitzgerald was "background information ... [not sufficient to] make Healey a joint participant in state action...." Ginsberg, 189 F.3d at 272; and Fitzgerald's active role in resolving the payment dispute,

11

including inducing Ginsberg to pay the bill and Healey's receipt of the check, revealed only Fitzgerald acted on his own initiative and not pursuant to any agreement or plan with Healey.

### C. Barrett, 189 F.3d 297

In Barrett, plaintiffs John and Lynne Barrett purchased a truck from defendant Mary Harwood, John Barrett's ex-wife. Harwood subsequently retained defendant Scott Smith to repossess the truck because of, according to Harwood, overdue payments. Anticipating that John Barrett would resist repossession, Smith contacted village police to request that a police officer be dispatched to the scene where Smith planned to repossess the vehicle. Sergeant Ritchie informed him that one would be sent if available and, ultimately, ordered Officer Durant to the scene, informing him that a breach of peace was anticipated. Officer Durant did not physically assist in the repossession. While Smith was beginning to connect the truck to his tow truck, John Barrett approached and asked what Smith was doing, to which question Officer Durant responded that Smith was repossessing the truck. John and Lynne Barrett objected to the repossession and provided Officer Durant with documents claimed to show proof of timely payments. After reviewing the documents, Officer Durant informed Lynne Barrett that the incident was a civil matter in which the police could not get involved and recommended they obtain a lawyer. Inflammatory words ensued between John Barrett

and Harwood, who had arrived at the scene, prompting Officer Durant to tell them to quiet down; then John Barrett struck Smith and Officer Durant told Barrett that he would put him in the back of the police cruiser if Barrett started any trouble. John Barrett understood the statement to mean the officer would arrest him if he took any further measures to resist repossession. The Barretts thus handed Smith the keys to the truck, "stating in an affidavit filed later that the officer's threat of arrest was the sole reason they gave up the keys." Barrett, 189 F.3d at 300. The Barretts sued, asserting violation of their constitutional right to due process under 42 U.S.C. § 1983.

The Second Circuit affirmed the district court's grant of summary judgment in favor of both Harwood and Smith, holding the summary judgment record insufficient to create a triable issue on whether Smith was acting under color of law when he repossessed the truck or whether Harwood was a state actor. "We have not had occasion to address directly the point at which official involvement in an otherwise private repossession is sufficient to constitute state action. Although several courts have considered this question in analogous circumstances, no bright line has been drawn delineating the exact point at which an officer's presence and activities at the scene of a repossession become state action in aid of the repossession." Barrett, 189 F.3d at 302. The Second Circuit found no state action under the facts because Officer Durant's actions were directed to preventing violence and

13