not facilitating repossession. Of significance to the Second Circuit were the facts that Durant was dispatched to keep the peace, told the Barretts that repossession was a civil matter, and was responding to violent conduct when telling Barrett he would put him in the cruiser if he started any trouble. Barrett's subjective interpretation of Officer Durant's statement as a threat with respect to resisting repossession was not material because "Officer Durant was acting well within his role as a law enforcement officer [in responding to an act of aggression]." Barrett, 189 F.3d at 303. Thus, the officer's role as peace keeper "did not convert the private act of repossession by Smith, the tower, into state repossession action." Id. at 303. Although Officer Durant's informing John Barrett that his truck was being repossessed did not make Smith, the tower, a joint participant in state action, the Second Circuit suggested that "an officer might ... be liable if the evidence showed ... that the officer came on the scene at the request of the repossessor and said to the debtor, 'don't interfere with this repossession,' or 'you know you're not the rightful owner of this truck.'" Id. at 303 (emphasis added); see also id. at 305 (Parker, J., concurring).

   D.   **The Present Case**

It is obvious, in light of Ginsberg and Barrett, that there is no genuine dispute on whether P-J's was a state actor - it was

14

not. It is undisputed that P-J's was not called by the State Police to tow, that the State Police gave no order to tow, and that the State Police did nothing more than lend their presence as a peace keeping measure. Spaziani did not request or bring police presence. He was summoned by a private person, Bill Langer. Upon arriving at the towing scene, where he first observed State Police, Spaziani simply confirmed with Trooper Bement that he would not be arrested if he towed Longmoor's automobile. Trooper Bement explicitly told Spaziani that his (Bement's) presence at the scene was not to aid any towing purpose: he could not order the car towed; the towing of the automobile was a civil matter; the towing was between Spaziani and Langer, and the State Police were present only to keep the peace. It was Langer who directed Spaziani to commence with the tow, and the police officers did not assist. As in <u>Ginsberg</u> and <u>Barrett</u>, there is thus a total and critical absence of any evidence of a meeting of the minds between Spaziani and the State Police to accomplish a common purpose together, here, the towing of Longmoor's automobile, and the State Police were at the towing scene as peace keepers in accord with their official duties.

That Langer informed Bement several days prior to May 17, 2000, of his plans for delivery of his modular home is the type of background information <u>Ginsberg</u> held cannot convert P-J's into a state actor. Trooper Bement's affidavit reveals that his response to Langer implicated only his role as peace keeper and

15

not civil dispute resolver. His response contains no common towing purpose with P-J's and the intent underlying Langer's inquiry is irrelevant. See Ginsberg, 189 F.3d at 272.

Longmoor's and Keene's deposition testimony that the State Police told Longmoor that her automobile was going to be towed and Longmoor's deposition testimony that they also told her that such towing could possibly cause damage to her vehicle create no triable issue as to whether P-J's was acting under color of state law. First, like Officer Durant's response to John Barrett that his truck was being repossessed in Barrett, the testimony reveals nothing more than an observation of the fact that Langer was going to have P-J's Spaziani tow Longmoor's vehicle and a corresponding observation that possible damage could result to a car towed while in gear. No inference can be drawn from the statement of the State Police that they were acting to accomplish with Spaziani the common goal of towing Longmoor's vehicle. Second, even accepting Longmoor's revisionist testimony "whether [you] surrender your keys or not," and characterizing the State Police statement as a threat to induce surrender of her keys, there is still no evidence that Spaziani sought such assistance with his towing job and any actual inducement achieved by the officers can only be ascribed to their own initiative. Accordingly, on this record, P-J's towing of Longmoor's car was not state action, and P-J's is entitled to summary judgment on plaintiffs' civil rights causes of action.

16

IV.  **P-J's Motion for Attorney Fees under 42 U.S.C. § 1988 [Doc. #58] and Plaintiffs' Motion to Strike [Doc. #55]**

In support of P-J's motion for attorney fees, defense counsel submits documents[10] that purport to recount the substance of communications between opposing counsel related to plaintiffs' claims against defendant P-J's. Plaintiffs' counsel does not dispute the account but instead moves to strike the documents as violating admissibility restrictions found in Fed. R. Evid. 408. The motion to strike will be addressed below. The documents reveal the following interactions between opposing counsel:

On January 9, 2003, Jason J. Vicente appeared on behalf of P-J's before the Court for a pre-filing conference on P-J's summary judgment motion.[11] Norman Pattis, an experienced practitioner before this Court, of the law firm Williams & Pattis, appeared on behalf of plaintiffs.[12] Also present were Steven Sarnoski on behalf of the State of Connecticut and Jim Tallberg on behalf of the Town of Barkhamsted. Pattis conceded at the conference that, if P-J's was called solely by a private

---

[10] An affidavit of defense counsel dated May 16, 2003, a facsimile from plaintiffs' counsel to defense counsel dated March 5, 2003, and two letters from defense counsel to plaintiffs' counsel dated respectively March 6 and March 17, 2003, including all attachments to the latter.

[11] Recognizing the significant consumption of the parties' and judicial resources necessarily involved in the filing and ruling on dispositive motions, this Court maintains a practice of holding pre-filing conferences for the purpose of exploring with counsel whether there is a more efficient, less expensive means of resolving the issue/s in dispute. See D. Conn. L. Civ. R. 16(a).

[12] Williams signed the complaint and plaintiffs' opposition to the present motion.

17

individual to the towing scene, no state action would have existed and P-J's could not be liable under 42 U.S.C. § 1983.[13] Pattis also indicated that, if P-J's provided an affidavit swearing that a private party called P-J's independent of any state action, P-J's should be let out of the case.

On February 7, 2003, Vicente spoke with Williams regarding what evidence Williams would require before P-J's could be dismissed from the case. Williams offer three options: 1) a telephone record showing that the call for towing services came from a neighbor and not the state police; 2) an affidavit from the individual at P-J's who took the call when it came in; and/or 3) an affidavit from the neighbor who called P-J's to tow Longmoor's car. On March 4, 2003, defense counsel (Wendy Kennedy Venoit) provided Williams with the affidavit of Spaziani and a letter from Trooper Bement generally detailing the facts (although in more limited form) set forth above. On March 5, 2003, Williams responded by letter, thanking defense counsel for the information and stating that, based on it, he "would be willing to recommend to [his] clients a mutual exchange of releases with your client and a dismissal as to your client with

---

[13] The Court's reporter's informal transcript of the conference reveals that, faced with P-J's claim that a private individual acting on his own called P-J's and no one else, Pattis strongly suggested that there would be no § 1983 claim against P-J's and also suggested that, because of the state action problem and an issue surrounding the extend of deprivation Longmoor suffered as a result of her car being towed, the claims against P-J's be put on a different track. Accordingly, the Court set a special expedited discovery and briefing schedule for the claims against P-J's.

18

prejudice." Mem. in Supp. of S. J. [Doc. #59] Vicente Aff. Ex. 3. On the same day, Vicente spoke with Williams, who stated that the information provided was sufficient to demonstrate that there was no state action on the part of P-J's and that mutual releases would be exchanged. Vicente had releases drafted and sent to Williams under cover letter dated March 17, 2003.

On March 28, 2003, Vicente spoke with Williams, who informed Vicente that his client had refused to sign the releases. In response, Vicente informed Williams that Longmoor had testified earlier in the week at a deposition (which was taking place as part of the discovery schedule involving the other eight defendants) that she had come to understood the State Police had not ordered her car towed. Upon hearing of her deposition testimony, Williams informed Vicente that he would review the testimony with his client and again request that she sign the release. Over a month passed and Williams did not act either to review his client's testimony or to pursue getting the releases signed. On May 7, 2003, Vicente spoke with Williams, who informed Vicente that he still had not discussed the matter with his clients. Williams then suggested that, if Vicente were concerned about the cost of filing a summary judgment motion, Vicente should make a settlement offer of a portion of the projected cost of filing the motion.

P-J's principally contends that the decision to continue the litigation against P-J's to the point of forcing a summary

19

judgment motion warrants an award of attorney fees in light of the unrebutted evidence demonstrating that P-J's was not a state actor. In a civil rights action under 42 U.S.C. § 1983, the Court has discretion to award a reasonable attorney fee to a prevailing party. See 42 U.S.C. § 1983. "Under this provision, as interpreted by the Supreme Court, fees are routinely awarded to a prevailing plaintiff who obtains some significant measure of relief, but are not so readily available to a prevailing defendant." LeBlanc-Sternberg v. Fletcher, 143 F.3d 765, 769 (2d Cir. 1998). "In order to avoid chilling the initiation and prosecution of meritorious civil rights actions, fees are not to be awarded to a prevailing defendant unless the plaintiff's action was 'frivolous, unreasonable, or groundless, or ... the plaintiff continued to litigate after it clearly became so.'" Id. at 770 (quoting Christiansburg Garment Co. v. Equal Employment Opportunity Comm'n, 434 U.S. 412, 422 (1978)). "[C]ourts must take care not to 'engage in *post hoc* reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation.'" Id. (quoting Christiansburg, 434 U.S. at 421-22). "[T]he determination as to whether the claims were frivolous, unreasonable, or groundless requires an evaluation of the allegations and the proof in light of the controlling principles of substantive law." Id.

Under the undisputed facts of the present summary judgment

20

record, and as demonstrated by the discussion above, the Court concludes that plaintiffs civil rights claim against P-J's became clearly unreasonable prior to P-J's filing its summary judgment motion. While exactly when an officer's presence and assistance at the scene of a towing reaches the point at which private towing takes on the character of state action is a highly factual inquiry, see Barrett, 189 F.3d at 302, the controlling Second Circuit precedent discussed above, Barrett and Ginsberg, leaves no doubt that there was no meritorious cause of action against P-J's. While Williams appears not to have been aware of the cited precedent, he clearly understood that the joint participation could not apply to P-J's involvement with Longmoor. Accordingly, the Court believes an award of fees in this case is justified. How much that award should be, however, is another matter. From this record, plaintiffs' claims against P-J's became clearly unreasonable by at least May 7, 2003, the date of Williams' attempted hold up, after which defense counsel began in earnest to prepare P-J's summary judgment motion. From the attorney fee submission, P-J's fees incurred after that date for the summary judgment motion and motion for attorneys' fees total $6,765. However, the present record contains no information regarding plaintiffs' ability to pay, a necessary consideration in awarding fees to a prevailing defendant. See e.g., Toliver v. County of Sullivan, 957 F.2d 47, 49-50 (2d Cir. 1992); Faraci v. Hickey-Freeman Co., 607 F.2d 1025, 1028-29 (2d Cir. 1979). Accordingly,

21

P-J's motion for attorney's fees [Doc. #58] is GRANTED, and, if plaintiffs claim inability to pay the described attorney fee, they are directed to submit to the Court by May 1, 2004 a sworn declaration in support of such position.

Assessing some amount of fees against plaintiffs, however, does not alleviate the Court's grave concerns regarding Williams' conduct. Williams having recognized the objectively baseless nature of his clients' § 1983 state action claim against P-J's, Williams knowingly put P-J's to the expense of filing a summary judgment motion to which he knew there was no good faith basis for opposition. Accordingly, Williams is ordered to show cause why the Court should not impose sanctions pursuant to 28 U.S.C. § 1927 and/or Fed. R. Civ. P. 11(c)(1)(B)[14] for a violation of Fed. R. Civ. P. 11(b)(2) with respect to his opposition to P-J's motion.[15] For discussions of the distinction between these two separate bases on which a district court may sanction an attorney, see Salovaara v. Eckert, 222 F.3d 19, 32-35 (2d Cir. 2000); Ted Lapidus, S.A. v. Vann, 112 F.3d 91, 96-97 (2d Cir. 1997).

---

[14] "On its own initiative, the court may enter an order describing the specific conduct that appears to violate subdivision (b) and directing an attorney, law firm, or party to show cause why it has not violated subdivision (b) with respect thereto."

[15] "By presenting to the court (whether by signing, filing...) A pleading, written motion, or other paper, an attorney ... is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances – (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law...."

22

In support of their motion to strike, plaintiffs argue that, under D. Conn. L. Civ. R. 56(a)3., motions for summary judgment must be supported by affidavit of a witness competent to testify at trial or evidence that would be admissible at trial, and that, under Fed. R. Evid. 408, the four submissions memorializing communications between opposing counsel here would not be admissible. The easy answer to plaintiffs' motion is that defense counsel did not submit the affidavit, facsimile, and two letters, in support of the motion for summary judgment as proof of what would be offered at trial in support of P-J's defense; rather, the submissions were made explicitly for the purpose of seeking an award of attorney fees under 42 U.S.C. § 1988. See EMI Catalogue Partnership v. CBS/Fox Co., No. 86Civ.1149, 1996 WL 280813, at *2 (S.D.N.Y. May 24, 1996)(holding court may rely on evidence of settlement negotiations in evaluating whether action was objectively unreasonable for purposes of award of attorney fees under § 505 of the Copyright Act). Thus, plaintiffs provide the Court with no basis on which to grant their motion; their motion [Doc. #55] is DENIED.

V.     **Intentional Infliction of Emotional Distress**

P-J's asserts that the summary judgment record does not support plaintiffs' state law claim for intentional infliction of emotional distress against it, see Longmoor v. Nilsen, 285 F. Supp. 2d 132, 142-43 (D. Conn. 2003), because the undisputed

23

record facts cannot support a finding of the essential elements of that tort, including extreme and outrageous conduct, severe emotional distress, and knowledge that plaintiffs' emotional distress was likely to result from P-J's conduct, see <u>Appleton v. Bd. of Educ. of Town of Stonington</u>, 254 Conn. 205, 210 (2000). Plaintiffs neither address this challenge in opposition nor make any mention of the state law claim.[16]

P-J's has satisfied its responsibility to inform the Court of the basis for its motion by pointing to the absence of evidence on an essential element of plaintiffs' intentional distress claim. See <u>Celotex</u>, 477 U.S. 322-24. While plaintiffs in response offer the affidavit of Longmoor, they point the Court to no favorable case law demonstrating that the facts sworn therein are material to the challenged elements of the common law claim for intentional infliction of emotional distress or otherwise provide the Court with an analysis of how such facts establish an issue of material fact when on its face the facts asserted in the affidavit do not show extreme or outrageous conduct. See <u>id.</u>; see also <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)(A fact is "material" for these purposes if it "might affect the outcome of the suit under the governing law."). Accordingly, P-J's is entitled to summary judgment on

---

[16] Plaintiffs' argument that Longmoor suffered emotional distress was made in opposition to P-J's argument that Longmoor suffered no cognizable constitutional injury or, in the alternative, that such injury was de minimus. See Opp'n [Doc. #63] at 13-15 (unnumbered).

24

plaintiffs' state law claim.[17]

## VI. Conclusion

As set forth above, P-J's motion for summary judgment on plaintiffs' claims [Doc. #58-1] is GRANTED; P-J's motion for attorney's fees [Doc. #58-1] is GRANTED; and plaintiffs' motion to strike [Doc. #55] is DENIED. The Clerk is directed to enter judgment in favor of P-J's. Attorney Williams is directed to show cause by May 1, 2004, why the Court should not sanction him pursuant to Fed. R. Civ. P. 11(c)(1)(B) for conduct in connection with and his filing of opposition to P-J's motion, and pursuant to 28 U.S.C. § 1927 for the same conduct. If plaintiffs claim inability to pay the described attorney fee, they are directed to submit to the Court by May 1, 2004 a sworn declaration in support of such position.

IT IS SO ORDERED.

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut, this 31st day of March, 2004.

---

[17] The Court does not decline to exercise supplemental jurisdiction under 28 U.S.C. § 1367(c)(3) because plaintiffs' intentional infliction claim against P-J's arises from the same controversy as plaintiffs' remaining § 1983 claims against the remaining State Police defendants. See 28 U.S.C. § 1367(a); see also Ciambriello v. County of Nassau, 292 F.3d 307, 325 (2d Cir. 2002).

25