not dispute that they acted under color of state law but argue that they did not as a matter of law violate Longmoor's constitutional rights to equal protection and procedural due process.

**A.    Equal Protection**

Longmoor asserts a class of one equal protection claim under Village of Willowbrook v. Olech, 528 U.S. 562 (2000)(per curiam). Pre-Olech, a selective enforcement claim based on the Equal Protection Clause in the Second Circuit required a plaintiff to demonstrate "(1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." Giordano v. City of New York, 274 F.3d 740, 750-51 (2d Cir. 2001). Post-Olech, Second Circuit decisions have provided mixed signals regarding whether the second element of a class of one selective enforcement claim continues after Olech to require a showing of such improper motivation or can be supported merely by evidence of irrational and wholly arbitrary conduct associated with intentional disparate treatment. Soon after Olech, the Second Circuit stated that proof of subjective ill-will was not an essential element, see Jackson v. Burke, 256 F.3d

16

93, 97 (2d Cir. 2001), but subsequently described Jackson's observation as dicta and explicitly declined to address whether Olech removed the requirement of impermissible motivation. See Harlen Assoc. v. Incorporated Village of Mineola, 273 F.3d 494, 499-500 (2d Cir. 2001); see also Hayut v. State University of New York, 352 F.3d 733, 754 n. 15 (2d Cir. 2003); DeMuria v. Hawkes, 328 F.3d 704, 707 and n.2 (2003); Giordano, 274 F.3d at 751. More recently, the Second Circuit has implied that Jackson's observation was correct, distinguishing between a "selective prosecution" equal protection claim having the two traditional elements and a "Olech-based equal protection claim" which does not require proof of selective treatment based on impermissible considerations but only selective treatment with no rational basis for differentiation. See Cobb v. Pozzi, 363 F.3d 89, 109-10 (2d Cir. 2004).[9]

There is no need to select among the alternative requirements for the second element of Longmoor's claim because there is no evidence in the record supporting the first element. There is no evidence of the existence of any property owners similarly situated to Longmoor much less that the four named State Police defendants (Laboy, Sweeney, Hazen, and Tolomeo)

---

[9] For a recent summary of conflicting authorities, including Second Circuit precedent, and exhaustive discussion of whether class of one Olech equal protection claims should require proof that official action was solely motivated by improper motives, see Bell v. Duperrault, 367 F.3d 703, 709-13 (7th Cir. 2004)(Posner, J., concurring).

17

treated Longmoor different than such individuals. In opposition to summary judgment, Longmoor has failed to direct the Court to any evidence regarding the named defendants' interaction with any other similarly situated landowners, for example, property owners seeking to exclude others from trespassing on their property. Thus, there is no evidence on which a rational jury could find for Longmoor against the State Police defendants on her Olech claim.

Longmoor essentially concedes her failure to raise a genuine issue of fact regarding the State Police defendants' disparate treatment but appears to argue that proof of disparate treatment is unnecessary to prevail, citing Esmail v. Macrane, 53 F.3d 176 (7th Cir. 1995) and Falls v. Town of Dyer, 875 F.2d 146 (7th Cir. 1989). See Opp'n [Doc. #74] at 6-9 (unnumbered). Longmoor's argument lacks merit. Every Second Circuit case cited in this section requires disparate treatment of similarly situated individuals as an essential element of an equal protection claim. Moreover, in vacating and remanding a 12(b)(6) dismissal of an Olech class of one claim that included allegations that a defendant police officer intentionally disregarded the plaintiffs' property rights in response to their complaints about a neighbor, the Second Circuit noted plaintiffs "face a significant hurdle in finding evidence to prove their allegations of selective enforcement and unequal treatment." Demuria, 328

F.3d at 707. Falls and Esmail are not to the contrary. Falls required the plaintiff to prove, among other things, that the defendant town enforced its portable sign ordinance against him and not his competitors, and Esmail required plaintiff to prove, among other things, that defendant mayor granted or renewed others' liquor licenses while denying plaintiff's notwithstanding that the others had engaged in conduct similar to or worse than plaintiff's infractions.

### B.  Procedural Due Process

Longmoor claims she was entitled to notice and a hearing before the State Police Defendants facilitated the trespasses of her neighbors on Lot 14A of the Woodland Acres Subdivision by ordering her to remove the chain blocking movement across the parcel. Longmoor places particular emphasis on her facts that she was forced to remove the chain under threat of arrest even after Bement explicitly told her she had a right to exclude others from Lot 14A. The State Police Defendants dispute Longmoor's version of events, claiming they never threatened Longmoor and Keene with arrest or forced them to remove the chain (other than to prevent imprisonment of others) but acted neutrally by preserving the peace and encouraging Longmoor to obtain judicial clarification regarding the scope of her right to exclude others from Lot 14A. If the legal resolution of

19

Longmoor's procedural due process claim rested on the resolution to this factual dispute, Longmoor's claim would have to be tried, although defendants' briefing often appears to forget their summary judgment motion cannot succeed where accounts differ on material facts. However, Longmoor's procedural due process claim must fail as a matter of law because, as defendants also argue, accepting her version of events leads only to the conclusion that any process to which she was due was available through adequate post-deprivation state remedies.

Generally "it has become a truism that 'some form of hearing' is required before the owner is finally deprived of a protected property interest." Logan v. Zimmerman Brush Co., 455 U.S. 422, 433 (1982).[10] However, "[procedural] due process ... is not a technical conception with a fixed content unrelated to time, place and circumstances [but] is flexible and calls for such procedural protections as the particular situation demands," Gilbert v. Homar, 520 U.S. 924, 930 (1997)(quotations and citations omitted), and therefore the determination of what process is due, including the timing and nature of the required hearing, is made by weighing the well-known factors set forth in Mathews v. Eldridge, 424 U.S. 319, 335 (1976):

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used,

---

[10] The State Police defendants do not contest in the present motion that Longmoor had a federally protected property interest in Lot 14A.

20

and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest.

As explained in Zinermon v. Burch, 494 U.S. 113 (1990), two Supreme Court cases, Parratt v. Taylor, 451 U.S. 527 (1981) and Hudson v. Palmer, 468 U.S. 517 (1984), represent an application of the Mathews factors "to the unusual case in which one of the variables in the Mathews equation - the value of predeprivation safeguards - is negligible in preventing the kind of deprivation at issue." Zinermon, 494 U.S. at 129. Taken together, Parratt and Hudson hold that, where the intentional deprivation of a property interest results from the random and unauthorized act of a state employee and not pursuant to some established state procedure, the State cannot predict or foresee such deprivation and therefore is not required under the Fourteenth Amendment to provide a predeprivation hearing if adequate postdeprivation state remedies exist. Thus, there was no due process violation in Parratt for prison officials' negligent loss[11] of hobby materials ordered by mail by an inmate where Nebraska provided a tort claims procedure for state prisoners to hear the claim and compensate Parratt for the value of the materials.

> The justifications which we have found sufficient to uphold takings of property without any predeprivation process are applicable to a situation such as the present one involving

---

[11] As pointed out in Zinermon, Parratt was decided before the Supreme Court held in Daniels v. Williams, 474 U.S. 327, 336 (1986) that "a negligent act by a state official does not give rise to § 1983 liability." Zinermon, 494 U.S. at 129 n.14.

21

> a tortious loss of a prisoner's property as a result of a random and unauthorized act by a state employee. In such a case, the loss is not a result of some established state procedure and the State cannot predict precisely when the loss will occur. It is difficult to conceive how the State could provide a meaningful hearing before the deprivation takes place.

Parratt, 451 U.S. at 541. No procedural due process violation was found in Hudson for a prison official's intentional destruction of an inmate's noncontraband personal property during a search of the inmate's locker and cell for contraband where Virginia provided several common-law remedies for the inmate seeking compensation for loss of his property.

> The underlying rationale of Parratt is that when deprivations of property are effected through random and unauthorized conduct of a state employee, predeprivation procedures are simply 'impracticable' since the state cannot know when such deprivations will occur. ... The state can no more anticipate and control in advance the random and unauthorized intentional conduct of its employees than it can anticipate similar negligent conduct.

Hudson, 468 U.S. at 533.

By contrast, the Parratt rule was held inapplicable to the termination of a complainant's cause of action by operation of an Illinois statute as jurisdictionally barred if a state official failed to take action on the complainant's charge of discriminatory conduct within 120 days of the charge having been brought.

> Here, in contrast [to Parratt], it is the state system itself that destroys a complainant's property interest, by operation of law, whenever the Commission fails to convene a timely conference - whether the Commission's action is taken through negligence, maliciousness, or otherwise. Parratt

22

> was not designed to reach such a situation. ... Unlike the complainant in Parratt, Logan is challenging not the Commission's error, but the "established state procedure" that destroys his entitlement without according him proper procedural safeguards.

Logan, 455 U.S. at 436; see also Hudson, 468 U.S. at 532 n.13 ("In Logan, we examined a claim that the terms of an Illinois statute deprived the petitioner of an opportunity to pursue his employment discrimination claim. We specifically distinguished the case from Parratt....").

In Zinermon, the Supreme Court extended the Parratt rule to deprivations of liberty and refined the scope of its application, including the meaning of "random and unauthorized." It held the Parratt rule inapplicable to the "voluntary" admission to a state mental hospital of a mental patient who was known or should have been known to be incompetent to provide informed consent where the admitting hospital personnel possessed broad powers and concomitant duties under Florida's comprehensive statutory scheme for admission of persons to mental hospitals to effect confinement of an individual and to implement procedural safeguards against unlawful confinement. Therefore, Florida law permitting suit against the admission personnel for unlawful confinement was inadequate to satisfy the demands of the Due Process Clause; the procedural safeguards used for Florida's involuntary admissions were required. Parratt and Hudson were distinguished on three grounds. See Zinermon, 494 U.S. at 136-

23

38.  First, the precise timing of an erroneous confinement to a mental hospital was considered foreseeable because the very nature of mental illness suggested that a person requesting treatment might be incapable of informed consent and thus erroneous confinement could be precisely pinpointed to the moment admission forms were provided for signature after state officials with delegated admission powers failed to question the person's faculties.  By contrast, such precision of prediction is not possible with prison guards' negligent losses of property or intentional harassment of prisoners even if the State can anticipate both kinds of activity may occur.  Second, a pre-confinement procedure for involuntary admission to a mental hospital was already in place and the same officials who admitted a voluntary mental patient needed only ensure such procedure was followed.  By contrast, "it borders on the absurd to suggest that a State must provide a hearing to determine whether or not a corrections officer should engage in negligent conduct," and similarly, "it would be absurd to suggest that the State hold a hearing to determine whether a guard should engage in [the malicious destruction of a prisoner's property]."  Zinermon, 494 U.S. at 137 (quotation omitted).  Third, the Court explained, an "unauthorized" act does not include every violation of state statute as it does not extend to deprivations of constitutional rights by state actors where the State has delegated the power

24

and authority to them to effect the deprivation and the concomitant duty to initiate the procedural safeguards established by state law to guard against such deprivations. See id. at 138.

The Second Circuit has noted that "the Zinermon decision has generated considerable confusion among the courts of appeals" and that what constitutes random and unauthorized conduct under Zinermon is a "legal thicket." Locurto v. Safir, 264 F.3d 154, 173 (2d Cir. 2001); see also 1 Martin A. Schwartz, Section 1983 Litigation § 3.07[E][1], at 3-182 (4th ed. 2003 & 2004-1 Supp.). Post-Zinermon Second Circuit decisions have found the Parratt rule applicable, and thus post-deprivation remedies sufficient to satisfy due process, where the chief of the Nassau County Police Department's Internal Affairs Unit ordered confiscation of an officer's license to drive where the chief had no authority to suspend driving privileges (a power relegated to the State of New York), see Gudema v. Nassau Cty., 163 F.3d 717, 724-25 (2d Cir. 1998), and where the director of the mayor's office of contracts and New York City's chief procurement officer issued a letter to the heads of all New York agencies ordering no procurement action with a contractor and cancellation of all existing contracts with that contractor as they came up for renewal because the director's actions were in violation of New York's City Charter and Procurement Policy Board rules, see Hellenic Am. Neighborhood

25

Action Comm. v. City of New York, 101 F.3d 877, 881 (2d Cir. 1996).[12]  Post-Zinermon Second Circuit decisions have found the Parratt rule inapplicable, and thus some form of pre-deprivation remedy required, where the chief of the ophthalmology department at Harlem Hospital Center and director of the residency program and other attending physicians changed the method of selecting the chief resident thereby denying plaintiff the position; the program directors acted within their delegated authority to preclude the plaintiff from the position, had authority to inform anyone who stood to be adversely affected by the change (including plaintiff) and provide them with an opportunity to demonstrate how they met the new criteria or that the new criteria should not apply to them, and in fact carefully deliberated among themselves before changing the selection method, see Ezekwo v. NYC Health & Hospitals Corp., 940 F.2d 775, 784-86 (2d Cir. 1991).  Where the commissioner of the New York State Department of Health summarily suspended a radiologist's medical license after investigation and issued statements to the press announcing the suspension and asserting the radiologist's

---

[12] It appears difficult to reconcile the Hellenic decision with the Supreme Court's observation in Zinermon that mere violation of governing law does not make official action unauthorized because the official in question may have delegated power both to effect the deprivation complained of and to guard against such deprivation by implementation of procedural safeguards. See Zinermon, 494 U.S. at 138.  Subsequently, the Second Circuit clarified that neither had it found in Hellenic that the director of the mayor's office of contracts and New York City's chief procurement officer had authority to suspend procurement for the complainant contractor or the duty to guard against an erroneous suspension nor had the parties' raised the issue of the director's authority in such matters.  See Diblasio v. Novello, 344 F.3d 292, 303 n.3 (2d Cir. 2003).

incompetence and potential criminal conduct, predeprivation remedies were also required. The commissioner was a high ranking official with final authority on many department matters, including communications to the press and authority to summarily suspend the radiologist's license, by statute summary suspensions were public upon issuance, and the commissioner had the duty to ensure that the department followed proscribed procedures governing summary suspensions, Diblasio, 344 F.3d at 302-03.

Applying these principles to Longmoor's version of events and undisputed record facts and assuming arguendo that the State Police Defendants knew that Longmoor had a right to exclude her neighbors from Lot 14A leads to the conclusion that the State Police defendants' actions were random and unauthorized. The State of Connecticut could not have predicted with precision the timing of Laboy's, Hazen and Sweeney's, and Tolomeo's deprivation of Longmoor's right to exclude others from Lot 14A. While the State Police are charged with handling a wide range of conduct and situations, including property disputes, and the State can anticipate that its law enforcement officers may intentionally deprive landowners of property rights, such deprivation cannot be pinpointed to specific moments. There is no procedure in place for Connecticut State Police officers to adjudicate on the spot property disputes between bickering neighbors. To the contrary, the State Police have no responsibility to clarify property

27

rights, are not trained to do so, and follow a standard procedure of telling disputing property owners to seek a civil remedy because they seldom know when called to a property dispute who the real owners are, what the precise nature of their rights are. To paraphrase only slightly, "it would be absurd to suggest that the State hold a hearing to determine whether [police personnel] should engage in [the intentional deprivation of a landowner's property rights]." Zinermon, 494 U.S. at 137. Finally, the State Police have no powers delegated to them to declare property rights and adjudicate property disputes or the duty to implement procedural safeguards to guard against such deprivations. Rather, the courts perform that function and the officers, after judicial clarification, carry out the orders of the courts with respect to property. The named defendants, including Tolomeo, are not high ranking officials with final decision making authority on the delineation of property rights and can only direct property owners to seek judicial remedies and implement court orders.

Having determined that the State Police Defendants' actions, as related by Longmoor, were random and unauthorized under Parratt and progeny, it is now necessary to consider whether the State of Connecticut provides Longmoor with adequate postdeprivation remedies for the State Police Defendants' facilitation of trespasses on her land. The State Police

28

Defendants argue that adequate post-deprivation remedies were available to Longmoor in the form of a common law quiet title action in Connecticut Superior Court, citing Tadros v. Middlebury Medical Center, Inc., 263 Conn. 235 (2003); Schwartz v. Murphy, 74 Conn. App. 286 (2002). Indeed, Longmoor filed a quiet title action over Lot 14A and apparently prevailed in that suit. There is nothing in the record indicating that the State Police Defendants are unwilling to or have not enforced the judgment in Longmoor's favor. The State Police Defendants also point to Longmoor's right to sue the State of Connecticut pursuant to Conn. Gen. Stat. §§ 4-141 to 4-165, which permits claims for damages resulting from tortious conduct of state police officers in the performance of their official duties. Longmoor does not challenge the adequacy of the post-deprivation remedies defendants claim are available to her under state law, and there is no basis in the record from which to conclude that they would have been insufficient under Parratt, 451 U.S. at 543-44.

Accordingly, taking the factual record most favorably to Longmoor, what is shown is at best random and unauthorized deprivations of Longmoor's right to exclude trespassers from Lot 14A and adequate state remedies to fully compensate her for any corresponding loss. Therefore as a matter of law Longmoor has suffered no violation of her procedural due process rights.

**V.     Conclusion**

For the reasons set forth above, the State Police Defendants' motion for summary judgment [Doc. #67] is GRANTED. Inasmuch as Longmoor and Keene have no remaining federal claims against the State Police Defendants, and Longmoor's intentional infliction of emotional distress claim against them does not arise from the same controversy as Longmoor's remaining federal claims against the Barkhamsted defendants, the Court declines, pursuant to 28 U.S.C. § 1367(c)(3), to exercise supplemental jurisdiction over plaintiff's remaining state claim and it is dismissed without prejudice.

IT IS SO ORDERED.

_____
Janet Bond Arterton, U.S.D.J.

**Dated at New Haven, Connecticut, this 23rd day of July, 2004.**

30