UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

FILED

AUG 6  4 31 PM '04

U.S. DISTRICT COURT
NEW HAVEN, CONN.

Lorraine LONGMOOR, and          :
    Lyndsey KEENE,          :
    plaintiffs,          :
              :
v.          :     No. 3:02cv1595 (JBA)
              :
Karl NILSEN, Michael FOX,          :
Town of BARKHAMSTED,          :
BARKHAMSTED Inland Wetlands          :
Commission, Trooper David          :
LABOY, Trooper HAZEN,          :
Trooper SWEENEY, and          :
LT. TOLOMEO, Defendants.          :

**Ruling on Motion for Summary Judgment of Defendants
Karl Nilsen, Michael Fox, Town of Barkhamsted, and
Barkhamsted Inland Wetlands Commission [Doc. #72]**

Defendants Nilsen, Fox, Town of Barkhamsted, and the

Barkhamsted Inland Wetlands Commission (the "Barkhamsted

Defendants") move pursuant to Fed. R. Civ. P. 56 for summary

judgment against plaintiffs' four remaining claims: violations of

equal protection, substantive due process, and procedural due

process under the Fourteenth Amendment to the United States

Constitution brought pursuant to 42 U.S.C. § 1983, and common law

claim of intentional infliction of emotional distress.  In

opposition, plaintiffs withdraw their procedural due process and

intentional infliction claims, see Opp'n [Doc. #77] at 1 nn. 1&2,

and do not address the challenge to their substantive due process

claim and do not include it in their listing of remaining claims,

see id. at 1.  The Court deems plaintiff's substantive due

1

process claim to be abandoned in the face of a summary judgment

contention that there exists no evidence which would permit a

jury to find "conduct so outrageously arbitrary as to constitute

a gross abuse of governmental authority...." <u>Natale v. Town of</u>

<u>Ridgefield</u>, 170 F.3d 258, 262 (2d Cir. 1999).

What remains then is plaintiffs' equal protection claim.   As

set forth below, the Court concludes that no jury could find

intentional and wholly irrational disparate treatment of

plaintiffs by defendants and therefore defendants are entitled as

a matter of law to summary judgment on the equal protection

claim.   In sum, defendants' motion [Doc. #72] is GRANTED.


I.    **Summary Judgment Facts**

Plaintiff Lorraine Longmoor resides at 24 Woodland Acres

Road in Barkhamsted, Connecticut, with her boyfriend, plaintiff

Lyndsey Keene.   Woodland Acres Road is a private dirt/gravel road

that provides residents of the Woodland Acres Subdivision access

to their adjoining properties and homes.   The subdivision

consists of 14 lots.   The lots were sold beginning in 1969, when

there were no zoning regulations in Barkhamsted.   Lot buyers were

required to obtain a pre-construction building permit and a post-

construction certificate of occupancy.   In 1972/1973, Longmoor

purchased lots 6, 9, 10, and 11, property covering approximately

eight contiguous acres, obtained a building permit, and

ultimately moved into her home at 24 Woodland Acres Road.    At

that time, access to Longmoor's home was by way of an

approximately 900 foot-long unimproved dirt and gravel road,

Woodland Acres Road, which had been constructed by the

subdivision developer, Burton Carroll.[1]

In the mid-1970s, Longmoor discovered that Woodland Acres

Road had not been constructed entirely within the 50-foot wide

published right of way depicted in the subdivision plot plan

filed with Barkhamsted, but instead encroached onto her property

and that of at least one other landowner in the subdivision.    In

1981, David Knauf, a prospective buyer of subdivision lot 14, was

having difficulty securing a mortgage for building a home due to

encroachment of Woodland Acres Road off the published right of

way onto a small portion of lot 14 where it abutted the road.    To

eliminate the encroachment problem, Knauf asked Longmoor if she

would accept a quitclaim deed to that portion of lot 14 re-

designated as lot 14A.    Longmoor, aware that Woodland Acres Road

traversed lot 14A, agreed and accepted the quitclaim deed in

exchange for $1.00.    Knauf retained an easement to cross lot 14A.

Lot 14A is not contiguous with Longmoor's other lots and is

approximately one-tenth of an acre.    As other lots in the

subdivision were acquired and sold over the ensuing years, other

subdivision residents crossed lot 14A to access their properties

---

[1] The road is still owned by Carroll and has never been accepted by
Barkhamsted as a public road.

3

and homes.

In 1988, Longmoor had that portion of Woodland Acres Road encroaching on her property at lots 6, 9, and 10, moved onto the published right of way depicted in the subdivision plot plan filed with Barkhamsted. Longmoor did not obtain a permit to move the road and the project had no effect on lot 14A. Longmoor believed the other residents of the subdivision should have contributed to the cost of relocating the road to its originally intended location, and planned to use her quitclaim deed to lot 14A to force their reimbursement. Also in 1988, the O'Garas, owners of lot 5, requested an easement from Longmoor to cross lot 14A. Longmoor did not grant the easement but gave permission to the O'Garas to cross the property. In addition, Longmoor believed Richard Case, owner of lot 13, had "prescriptive rights" to use lot 14A by virtue of having crossed over it for thirty years and, when Case sold lot 13 to Wayne Gracie and Tracy Garafolo, gave the purchasers oral permission to use Woodland Acres Road over lot 14A.

In 1998, Longmoor asked the O'Garas to pay for an easement to lot 14A but the O'Garas declined. In March 2000, Longmoor met with the other landowners and residents of the subdivision to discuss their acquisition of easements from her to lot 14A. No easements resulted from this meeting but Longmoor did execute a written agreements with neighbors William Langer and Kevin and T.

4

Chandler O'Gara agreeing to grant and sign easements in exchange
for their making improvements to Woodland Acres Road.   No
easements were ever granted to Langer and O'Gara.

On March 21, 2000, Langer applied to the Zoning Enforcement
Officer[2] in Barkhamsted for a permit to build a home on lot 2 of
the subdivision, which is located across Woodland Acres Road from
property owned by Longmoor.   As with all previous applicants who
had built homes in the subdivision, the Zoning Enforcement
Officer granted Langer's permit application.   The permit issued
on April 4, 2000 and Langer immediately began construction.   In
the same month, on advice from her attorney, Longmoor erected two
posts and a chain across Woodland Acres Road at lot 14A blocking
vehicular access into the subdivision.   The posts and chain gave
rise to a series of disputes with neighbors, including Langer,
involving state police but none of the Barkhamsted Defendants
were involved in those disputes.

On May 9, 2000, Longmoor wrote defendant Karl Nilsen,
Barkhamsted's Zoning Enforcement Officer and Inland Wetlands
Officer, complaining that excavation and construction occurring
on Langer's property were not completely protected by a siltation
fence or hay bails in violation of zoning and wetlands
regulations and were causing runoff from Langer's property to
drain under Woodland Acres Road into a pond on Longmoor's

---

[2] This individual is not identified in the record.

property.  Longmoor requested immediate enforcement of the
regulations against Langer "before a rain storm causes erosion
and siltation contaminating [her] pond."  On May 11, 2000,
Longmoor sent Nilsen a second letter stating her pond was full of
silt after heavy rains the night before, acknowledging awareness
that a silt fence had been installed on Langer's property,[3]
surmising that another source of silt must exist if the fence was
performing effectively, and requesting immediate investigation.
In response, on May 11,[4] Nilsen conducted an inspection of
Longmoor's property, including her pond, and did not find any
evidence of siltation coming from Langer's property.[5]  Nilsen
also inspected the construction site on Langer's property and was
unable to trace any siltation to it.  On May 15, 2000, Nilsen
wrote Longmoor informing her that he had found no evidence of
siltation at Langer's construction site and was unable to trace

---

[3] It appears from Longmoor's own testimony that Nilsen had delivered a
copy of Longmoor's May 9 letter to Langer with an order to address the
siltation fence problem.  Longmoor Depo. at 392:11-393:18.

[4] The record does not reveal how Nilsen received Longmoor's letter on
the same day she sent it.  However, this fact is undisputed.

[5] Longmoor's deposition testimony is that there was siltation all over
her property and that it would have been "perfectly visible" for anyone to
see.  Longmoor admits, however, that the source of it was obscured since she
saw it coming from Langer's property during a rain storm and that, when Nilsen
arrived, the rains had stopped and with them the flow pointing to Langer's
property as source.  See Longmoor Depo. at 343:11-19 ("I physically saw that
when it was raining.  When Mr. Nilsen came, it was not raining.  So,
therefore, he did not see sediment and silt coming from Mr. Langer's driveway
crossing the road and going onto my property.  He saw only some signs of
erosion on the road which had existed for some time and maybe was surmising
that all this siltation and sediment that was on my property was coming from
the road.").

any to Longmoor's pond.  Longmoor then complained to the
Connecticut Department of Environmental Protection ("DEP") about
the alleged siltation problem.  DEP investigator Brian
Golembieski responded and conducted an inspection of Longmoor's
pond.  Mr. Golembieski concurred with Nilsen, finding no wetlands
violations caused by Langer's construction.

On May 19, 2000, Longmoor sent a letter to defendant Michael
Fox, First Selectman and Open Burn Official of Barkhamsted,
requesting a cease and desist order on all construction occurring
on Langer's property because of runoff water depositing silt onto
Longmoor's property, including into her pond and lot 14A, as
exacerbated by the heavy construction equipment moving along
Woodland Acres Road.  It is undisputed, however, that Fox had and
has no authority as First Selectman to issue cease and desist
orders in response to complaints like Longmoor's.  On June 6,
2000, Longmoor sent a follow up letter to Nilsen, reiterating her
request for a cease and desist order on grounds of runoff as
exacerbated by erosion caused by heavy equipment and adding that
Langer had been trespassing across lot 14A as a result of his
building permit.  On June 14, 2000, Longmoor sent Nilsen another
letter, requesting that Barkhamsted consider requiring a permit
for work on Woodland Acres Road pursuant to Conn. Gen. Stat.
§§ 22a-14-22a-20, 22a-36-22a-45 and reasons for any denial of the
request.  The letter provides no details or information

7

identifying the nature of any work or who was going to perform it.[6]  On June 27, 2000, Nilsen replied to Longmoor's June 6 and June 14 letters.  Nilsen informed Longmoor that he found no violations of Barkhamsted's zoning or wetlands regulations in connection with Langer's construction and that the DEP had concurred with Nilsen's findings after independent inspection.[7] In addition, Nilsen informed Longmoor that his inspection of lot 14A revealed disrepair and significant erosion and that she should submit reconstruction plans for it to the Planning and Zoning Office of Barkhamsted by July 11, 2000.  Nilsen had

_____

[6] Although very vague, Longmoor appears to indicate that this letter was intended to inform Barkhamsted officials that her neighbors were planning to relocate Woodland Acres Road away from lot 14A to its originally intended location without the required wetlands permit and in doing so were going to destroy an intermittent watercourse and use unauthorized toxic materials to build a new road.  See Longmoor Depo. at 430:1-439:22; see also Keene Depo. at 209:24-213:25; Am. Compl. [Doc. #31] ¶ 9G.  The neighbors eventually did relocate the road in July 2001.  There is nothing in Longmoor's letter that even suggests these possible events.  Moreover, there is nothing in either Longmoor's or Keene's deposition testimony from which a jury could conclude that any named defendant agreed with Longmoor's and Keene's conclusory allegations that the relocation violated wetlands laws.  Keene refers to a complaint about the relocation he lodged with a Guy Morin of the Barkhamsted Inland Wetlands Commission prior to the relocation complaining about the possibility of imminent construction of the road but provides no other details regarding the contents of the complaint or that it charged the planned relocation was a violation of wetlands regulations.  See generally Keene Depo. at 172:13-175:12; 198-208.  Keene also admits Morin responded to his letter, cryptically describing the response as indicating no action could be taken without an "application," see Keene Depo. at 208, which suggests, among other things, that Morin took no view as to the possibility of a violation. Similarly, while Keene provided extremely vague testimony that "possibly a DEP official may verbally have said, 'Yes, that's a water course'," Keene Depo. at 206:7-8, there is no evidence that such communication was relayed to any named defendant.  This allegedly illegal diversion of an intermittent watercourse is the subject of a state lawsuit brought by Longmoor against Langer, Zappula, and others pursuant to Conn. Gen. Stat. § 22a-44(c), which allows for full litigation over whether or not certain activities were in fact wetlands violations.  See Keene v. Langer, No. CV020088105S, 2003 WL 964249 (Conn. Super. Feb. 26, 2003); see also Keene Depo. at 213:15.

[7] It is unknown whether Nilsen conducted a second inspection or was referring to his original May 11 inspection.

received complaints in mid-June from Kevin O'Gara and William Langer charging Longmoor with clear cutting and logging in the subdivision causing siltation and encroachment on wetlands and failing to maintain lot 14A with attendant siltation in adjacent areas.  Longmoor hired an engineer after receiving Nilsen's request, concluded that erosion on lot 14A was not her fault, and therefore did not submit a reconstruction plan.[8]  Notwithstanding Longmoor's non-compliance, Nilsen took no enforcement action against her with respect to the erosion and concluded that her tree-cutting was solely on her property and therefore within her right to do.[9]

Langer completed construction by early July 2000 and received a final certificate of occupancy from the Zoning Enforcement Officer[10] on July 19, 2000.  On August 17, 2000, Longmoor filed an appeal with the Zoning Board of Appeals in Barkhamsted, contending that the certificate of occupancy should not have issued because access to Langer's property required trespassing over Longmoor's lot 14A.  The appeal was heard on

---

[8] Longmoor says her engineer produced a report for her concluding that any erosion on lot 14A was the result of water coming from upland to lot 14A. Longmoor Depo. at 354:12-355:3.  There is no evidence in the record that this report was supplied to Nilsen or any other defendant or that this report suggested any violation associated with the source of the water.

[9] Nilsen also received complaints from neighbors Kevin O'Gara, Richard Zappulla, and Carl Zappulla in mid-June and early July 2000 charging Longmoor with operating a boarding house and having catered parties on her residence in violation of zoning regulations.  Nilsen took no action with respect to these complaints.

[10] This person is not identified as Nilsen in the record.

9

November 29, 2000 and denied on December 6, 2000 on the grounds

that the original transfer of lot 14A to Longmoor from Knauf was

improper[11] and Longmoor's appeal was untimely as not brought

within 30 days of issuance of Langer's construction permit as

Longmoor was aware of the construction.  Longmoor appealed to

Connecticut Superior Court, which ultimately affirmed (albeit on

different grounds)[12] the zoning board's decision and the validity

of Langer's certificate of occupancy.

On September 7, 2000, Longmoor submitted an Open Burning

Application to Barkhamsted, requesting permission to burn several

piles of brush at 24 Woodland Acres.  Fox inspected Longmoor's

burn piles and noticed inclusion of items larger than permitted

for permitted burning.  He asked Longmoor to remove one stump and

Longmoor said she would burn in small piles and be careful.  Fox

signed and approved the permit.  Fox's actions in this regard

were consistent with the normal execution of his duties as Open

Burn Official, including regular on-site inspection of piles

---

[11] There are several allegations in Longmoor's Local Rule 56(a)2.
Statement to the effect that the Barkhamsted Defendants clearly knew neighbors
were trespassing on lot 14A and yet did nothing to prevent the trespasses even
though asked to do so.  However, Longmoor has not provided any evidence that
defendants knew that trespass was occurring or, as would be required to raise
a material issue of fact on disparate treatment, that other Barkhamsted
residents in similar situations to Longmoor were treated differently.
Longmoor also offers no evidence that the Barkhamsted defendants had any
jurisdiction to respond to complaints of trespass.  Rejection of Longmoor's
appeal on the grounds of improper transfer of lot 14A suggests Barkhamsted did
not recognize the property as belonging to Longmoor because it had been
transferred in violation of zoning laws such that no trespass resulted from
neighbors' passage over it.

[12] See Longmoor v. Zoning Board of Appeals of the Town of Barkhamsted,
No. CV010084128S, 2002 WL 31235446 (Conn. Super. Aug. 30, 2002).

after receipt of an open burn application.[13]

In early October 2000, Nilsen learned Longmoor had dug a ditch across her lawn to the edge of a wetland bog adjacent to her property.  On October 10, 2000, Nilsen sent Longmoor a cease and desist order, stating that Longmoor had performed a regulated activity without a permit in violation of inland wetlands regulations and ordering Longmoor to appear before the Barkhamsted Inland Wetlands Commission and provide an explanation regarding the nature of the work she had performed and why she had done so without a permit.  Longmoor responded to the letter and made a presentation before the Commission, after which Nilsen took no further action.[14]

---

[13] Longmoor testified in her deposition that "everybody who comes to the town hall takes a burning permit out, and they do not have their proposed piles inspected."  Longmoor Depo. at 267:15-18, 278:17.  Longmoor, however, provides no basis for personal knowledge for her statement, including how she would know whether Fox routinely inspected burn piles or instances she knows of in which an inspection was not done, see e.g. id. at 253:12-15 ("I believe that he had never done that before when other people had come to the office to get a burning permit."), and in fact admitted lack of personal knowledge, see id. at 268:24-269:7 (Q. ... And you don't know whether Mr. Fox had ever gone out and taken a look at a burn pile before it was burned; isn't that correct? A. Right Q. Because you haven't traveled with Mr. Fox on his duties so you don't know if he had ever gone out and examined other burn piles; is that correct? A. Correct.).  Moreover, there are no burn permit applications in the record other than Longmoor's for comparison to determine whether there was a substantive basis for distinguishing between applications triggering on-site inspection and those not.

[14] In her Local Rule 56(a)2. Statement, Longmoor alleges that the cease and desist order constituted a retroactive application of regulations against Longmoor that had never been done to any other Barkhamsted resident.  The deposition testimony cited in support of the allegation, see Longmoor Depo. 407:20-410:16, however, neither provides evidence of Barkhamsted's prior practices with respect to retroactive application of wetlands regulations nor any evidence that the defendants were aware that the regulation at issue did not apply to Longmoor when the cease and desist order issued.  While Longmoor claims the applied regulation was adopted after issuance of the cease and desist order, the supporting evidence to which she points reveals it was adopted by September 26, 2000, approximately two weeks prior to issuance of the October 10 cease and desist order.

## II.    Summary Judgment Standard

Summary judgment "shall be rendered forthwith if the
pleadings, depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if any, show
that there is no genuine issue as to any material fact and that
the moving party is entitled to a judgment as a matter of law."
Fed. R. Civ. P. 56(c).  Where, as here, a party moves for summary
judgment against claims on which the non-moving party bears the
burden of proof at trial, the moving party still shoulders the
initial responsibility to inform the district court of the basis
for its motion, namely, to identify those portions of the court
or discovery record together with affidavits, if any, believed to
demonstrate the absence of a genuine issue of material fact on an
essential element of the non-moving party's claim.  See Celotex
Corp. v. Catrett, 477 U.S. 317, 322-24 (1986).  The non-moving
party must then go beyond the pleadings and by her own
affidavits, or by evidentiary support found in the court or
discovery record, designate specific facts establishing a genuine
issue of material fact on any element essential to the non-moving
party's case that was sufficiently called into question by the
moving party.  See id..  The "District Court must resolve any
factual issues of controversy in favor of the non-moving party,"
Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990), mindful
that "at the summary judgment stage the judge's function is not

12

himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). The District Court's ultimate concern is "whether there is a need for a trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250.


## III. Discussion

For Longmoor's class of one § 1983 equal protection claim under Village of Willowbrook v. Olech, 528 U.S. 562 (2000)(per curiam) to survive summary judgment, there must be evidence from which a jury could conclude the Barkhamsted Defendants intentionally selectively treated Longmoor compared with other similarly situated individuals and at a minimum that such selective treatment was irrational and wholly arbitrary (if not also occasioned by subjective ill will). See Cobb v. Pozzi, 363 F.3d 89, 109-10 (2d Cir. 2004); Harlen Assoc. v. Incorporated Village of Mineola, 273 F.3d 494, 499-500 (2d Cir. 2001); see also Hayut v. State University of New York, 352 F.3d 733, 754 n. 15 (2d Cir. 2003); DeMuria v. Hawkes, 328 F.3d 704, 707 and n.2 (2003); Giordano v. City of New York, 274 F.3d 740, 751 (2d Cir.

13

2001).[15]  Longmoor claims the Barkhamsted Defendants
intentionally ignored Longmoor's complaints but entertained and
investigated those of her neighbors, enforced wetlands and zoning
regulations against Longmoor but not her neighbors, and permitted
trespasses on lot 14A by Longmoor's neighbors (and presumably,
although Longmoor does not say, prevented such trespasses in
other similar situations).  See Opp'n [Doc. #77] at 6
(unnumbered).  There is no evidence to support a jury finding for
Longmoor on such claims.

In response to Longmoor's May 9 letter, Nilsen apparently
ordered Langer to install a silt fence and Langer did so.  In
response to Longmoor's May 11 letter, Nilsen conducted a full
same day on-site investigation of Longmoor's and Langer's
properties and saw no evidence that siltation was flowing from
Langer's property to Longmoor's, a finding admitted by Longmoor
and confirmed by DEP.  Longmoor reiterated essentially the same
complaints by letters of June 6 and 14 of 2000, and Nilsen
provided a written reply on June 27.  By contrast, Nilsen ignored
neighbor complaints regarding Longmoor running a boarding house
and catering parties, and only acted on neighbor complaints made
in mid-June 2000 about erosion on lot 14A that were consistent
with what Nilsen already knew from his earlier on-site
verification at Longmoor's property.  In fact, there is no

---

[15] The Barkhamsted Defendants do not dispute for purposes of the present
motion that they acted under color of state law.

14

evidence that Nilsen even responded to the mid-June complaints of O'Gara and Langer.  Clearly, with respect to filed complaints, there is no evidence that the named defendants treated Longmoor different than anyone else.[16]

Regarding application of regulations, Nilsen required Longmoor to submit a reconstruction plan only after on-site verification of erosion regarding which Longmoor herself admits it would have been reasonable for Nilsen to have believed was lot 14A's problem.  Nilsen took no action against Langer's property after his site visit because, contrary to the situation on lot 14A, he found no violations, a finding uncontradicted in the record and confirmed by DEP.  Similarly, Nilsen's issuance of a cease and desist order to Longmoor followed Nilsen's learning of Longmoor's having dug a ditch near a wetland bog.  Upon finding a perceived wetland violation, Nilsen took action, requiring Longmoor to explain her actions to the Commission.  There is no evidence offered that Nilsen did not believe a true violation to exist or that Nilsen ignored other similar situations.  To the contrary, Nilsen's taking action upon belief of an erosion violation to exist is consistent with the action taken in connection with Longmoor's ditch.  Fox approved Longmoor's open burn application after evaluating it in the same manner he dealt

---

[16] Fox made no response to Longmoor's May 19 letter but he had no authority to provide the relief requested, and there is no evidence in the record of similar complaints made to Fox or how he responded to them.

15

with all such applications, and Longmoor offers no evidence to
the contrary, either personal knowledge that he never conducted
investigations for any other applications or that, if he did
conduct on-site investigations for some applications, hers was
similar to those for which Fox routinely did not.  Finally, with
respect to the neighbors' relocation of Woodland Acres Road away
from lot 14A in July 2001, there is simply no evidence in the
record regarding what any named defendant knew about the
relocation, if they knew about it at all,[17] whether they agreed
that the relocation was a wetlands violation, or what was in
Keene's complaint to Morin such that one could compare it to
other complaints to gage any disparity of official action in
response.  In sum, there is simply no evidence to support the
conclusion that the Barkhamsted Defendants enforced regulations
against Longmoor or Keene and not against similarly situated
individuals.

Finally, there is no evidence that any of the named
defendants had authority to prevent trespasses over Longmoor's
lot 14A, believed any such trespasses were occurring on any
property of Longmoor's, or had responded differently to similar
complaints of other residents.  Thus, there could be no jury

---

[17] There is evidence in Keene's deposition that Fox knew about plans for
the relocation and even may have attempted to assist it but no evidence that
he perceived it to be a wetlands violation, received complaints about it, or
had any authority to order the relocation plans to stop if he had believed
there to be a wetlands violation.

16

finding of disparate treatment in Longmoor's favor with respect to her claims of trespass.

## IV.  Conclusion

As set forth above, defendants' motion [Doc. #72] is GRANTED.  All claims having been dismissed or disposed of on motion for summary judgment, see Rulings [Docs. ##65, 80, 85], the clerk is directed to enter judgment in favor of all nine defendants and close this case.

IT IS SO ORDERED.

_____
Janet Bond Arterton, U.S.D.J.

**Dated at New Haven, Connecticut, this _10_ day of August, 2004.**

17